LONGBERG, Plaintiff, v. H. L. GREEN COMPANY and another, Defendants. [Two appeals.] *

*January 9—February 6, 1962.*

* See post, p. 516a, for disposition of motion for rehearing.

506

For the plaintiff there was a brief and oral argument by *Frank L. Morrow* of Eau Claire.

For the defendant H. L. Green Company, Inc., there were briefs by *Ramsdell, King, Carroll & Barland* of Eau Claire, and oral argument by *George Y. King.*

For the defendant Thomas G. Kliszcz there was a brief by *John P. Thornton* of Eau Claire, and *Genrich, Terwilliger, Wakeen, Piehler & Conway* of Wausau, and oral argument by *Herbert L. Terwilliger.*

FAIRCHILD, J. The following propositions are virtually unquestioned on appeal: (1) Dr. Kliszcz or his employee failed to exercise ordinary care in permitting disconnection of the hose and the flow of water in the south operatory room. (2) Some of this water ultimately dripped from the false ceiling of the entranceway to the floor below. (3) A substantial part of the floor of the entranceway was covered with ice from one-eighth to one-quarter inch thick. (4) Mrs. Longberg slipped on the ice and was injured as a result. (5) Green Company's failure to remove or treat the ice was a violation of duty under the safe-place statute if it can be said under the circumstances that its employees were chargeable with notice of the hazard before Mrs. Longberg fell.

The appeals raised three questions: (1) Was there evidence to sustain the finding that the dripping of the water was a cause of the injury? (2) Assuming that it was a cause, was there a limitation on Kliszcz's duty or some other policy rule which insulates him from liability to Mrs. Longberg for negligence? (3) Was there evidence that a slippery condition had existed long enough that the store employees should have discovered it before she fell?

A more-detailed statement of the facts is essential:

The entranceway is 13 feet wide at its front along the edge of the sidewalk. It becomes narrower toward the doorway which is six feet back from the sidewalk and five feet wide. The floor is composed of quarry tile which gets slippery when wet. The tile floor sloped upward toward the door so that it is about five or six inches higher at the door

than at the front. There is a narrow strip of asphalt between the sidewalk and the edge of the tile floor and this strip slopes more steeply than does the floor.

Mrs. Longberg walked into the entranceway and was approaching the door when she fell. She estimated that she was 12 to 16 inches from the door. Kliszcz's counsel makes the point that this estimate would place her uphill from any point where the water was dripping onto the floor. (The light fixture through or around which the water was coming was about 34 inches forward from the door.) We think that her estimate of the distance is not controlling. There was also testimony that after she had fallen, she was partly on the sidewalk and partly in the entranceway.

Immediately after her fall she felt slippery ice on the floor and saw water on the windows and ceiling. She also felt moisture on her face. Others testified that after her fall they saw water dripping from the ceiling and running down the south show window. There was testimony that as much as three quarters of the floor was covered with ice and that the ice was one-eighth to one-quarter inch thick; that water was dripping from the ceiling directly over the ice. The water was seen dripping as late as 6:30 that evening, and the next day there was a thin strip of ice down the show window.

Mrs. Longberg was helped inside the store and the manager was called. After noticing the water he went up to Kliszcz's rooms and found Kliszcz's assistant mopping up the water in the south room.

It was established that the south room was above the south show window and not the entranceway. The water flowed through an opening around a water pipe in the floor of the south room. The false ceiling over the show window was two feet, seven inches below the floor, and the same false ceiling extended over the entranceway. The hole in the floor of the south room was three feet, eight inches south of the light fixture in the ceiling over the entranceway. If the water had fallen directly downward, it would have fallen inside the

show window. Some water evidently did, and merchandise in the window was found wet the next morning. Some of the water apparently found its way in some fashion down the outside of the show window a few inches to the north. Much of the water, however, followed a different course. For some reason a plank had been laid north-south across some east-west stringers which supported the ceiling. The plank happened to have been warped in such fashion as to form something of a trough. It was demonstrated after the accident that water dripped from the hole in the floor of the south room onto the end of this plank and flowed north to a point where it dropped off above the light fixture, finding its way through or around the fixture onto the under side of the ceiling. Had the plank not been in the position and condition described, the water would presumably have been blocked from flowing to the north by the east-west stringers. At the time of the demonstration one quart of water was poured on the floor of the south room and it took about three minutes for it to reach the light fixture.

There was testimony as to the rate of flow of water from the hose, the length of time it may have been flowing before Dr. Kliszcz shut it off, and various experiments demonstrating the time it would take water of a certain temperature to freeze under certain conditions.

It was determined that at full pressure the hose in question would emit two quarts of water in five minutes.

Dr. Kliszcz testified from recollection that he did certain work in the south room for about five minutes and that at other times he was busy with a patient in another room. He testified that he left the south room about 4:35 p. m.; that the hose must have become disconnected after that, and could not have flowed for more than two minutes before it was discovered. His testimony was corroborated to some extent by his assistant, who first discovered the flowing water. The jury, however, was not obliged to accept as verities either the testimony as to the time Dr. Kliszcz left the south room

or the testimony that the water flowed for less than two minutes.

A professor of geography, who specializes in climatology, testified as an expert. He made various experiments in the freezing compartment of his refrigerator. He took a tile similar to the ones in the floor of the entranceway and stabilized it at nine degrees Fahrenheit and took water at room temperature. When 20 drops of water were placed on the tile, the water took eight minutes to freeze. The length of time increased as the quantity of water increased. When 10 cubic centimeters of water, a little more than one third of a fluid ounce, were placed on the tile at nine degrees, the water was partially frozen at thirty minutes but at the end of fifty-five minutes there was still some moisture. He also experimented with tile at the same grade as that of the floor of the entranceway and found that if there were more than three cubic centimeters the water would not stay in the incline. The evidence shows, however, material conditions such as the wind at the time of the event and the dripping of the water from a suggested height of 11 or 12 feet which the professor did not duplicate in his experiments. His testimony suggests that when water falls from a height and strikes a hard surface it breaks into smaller particles, or spray, and that it was cold enough at the time to freeze such water in twenty or thirty minutes. He said, however, it would require "an awful lot" of water going through that process before there could be one eighth of an inch of ice. Kliszcz argues that because of the amount of time it would require for water from the dental equipment to reach the floor of the entranceway and be reduced from body temperature or room temperature and frozen, and because it could not have started flowing before 4:35, the water for which he was responsible could not have formed the ice. One weakness of the argument is that Kliszcz's testimony as to the time need not be accepted as a verity. Another is that the water may, without forming all the ice that was present,

have made ice which was already there substantially more slippery.

Mrs. Longberg testified that the day of the accident was cold and cloudy; that there was a trace of snow, and snow flurries, but as she walked along the sidewalk, her feet did not leave tracks in the snow. She testified at one point that there was dirty snow on top of the ice in the entranceway, such as people might have tracked in. There was no ice on the sidewalk. The records of weather observations at the airport showed a trace of snow on January 1st, 6th, and 7th, and no other precipitation during that period; temperatures ranged from one degree below zero to 12 degrees above zero. There were four inches of snow on the ground on January 7th.

Several store employees admitted that the tile floor of the entranceway was slippery when wet. The manager's son had been given the duty of inspecting the floor of the entranceway. It was his practice when it was snowing to check it about every hour or hour and a half. The manager testified that at that time of the year he usually checked for accident hazards after returning from dinner, again at 3:30–4 o'clock; and then when the store was closed.

There was no positive testimony by any store employee describing the condition of the floor of the entranceway at any time on January 7th before Mrs. Longberg fell. One of the employees testified that she had gone to the bank about 11:30 and that she did not recall whether there was any ice or snow in the entranceway at that time. The manager's testimony as to any inspection he made in the afternoon of January 7th was indefinite as to time and as to whether he observed the condition of the floor. His son did not remember whether he made any inspection that afternoon.

1. *Negligence of Kliszcz as a cause of the accident.* Defendant Kliszcz contends that the earliest time the flow of water could have begun (4:35), the time required to freeze water starting at body temperature, and the slope of the floor

were physical facts demonstrating that the ice on the floor could not have been formed from the water escaping in the dentist's south room. We have already suggested that Dr. Kliszcz's testimony as to time, based on recollection of his activities, need not be accepted as a verity, and that the expert's experiments did not duplicate all the material conditions.

In any event, ordinary human experience would permit the jury to find that if the leaking water did not form the ice, the presence of which was undisputed, water dripping onto already existing ice would make it much-more slippery. This analysis would justify a finding that the leaking water was a cause of Mrs. Longberg's fall and injuries. There is an indication, moreover, that the jury may have adopted the latter analysis. The verdict was so framed as to call for answers to the comparison question even though plaintiff was not found negligent. The jury attributed 70 per cent of the causal negligence to Green Company, more than twice the 30 per cent attributed to Dr. Kliszcz.

2. *Limitation on liability of Kliszcz*. Dr. Kliszcz next contends that he breached no duty of care owed Mrs. Longberg, citing *Palsgraf v. Long Island R. Co.*[1] In that case, in an opinion by then Chief Judge CARDOZO, the New York court of appeals held that for a plaintiff to recover for harm caused her by particular careless conduct, the conduct must, in addition to being a wrong with reference to someone else, have subjected the plaintiff to a hazard apparent to the eye of ordinary vigilance. It was stated, at page 342: "The plaintiff sues in her own right for a wrong personal to her, and not as the vicarious beneficiary of a breach of duty to another."

In a dissenting opinion, Judge ANDREWS stated, at page 350:

"The proposition is this. Every one owes to the world at large the duty of refraining from those acts that may un-

[1] (1928), 248 N. Y. 339, 162 N. E. 99, 59 A. L. R. 1253.

reasonably threaten the safety of others. Such an act occurs. Not only is he wronged to whom harm might reasonably be expected to result, but he also who is in fact injured, even if he be outside what would generally be thought the danger zone. There needs be duty due the one complaining, but this is not a duty to a particular individual, because as to him harm might be expected. Harm to someone being the natural result of the act, not only that one alone, but all those in fact injured may complain."

In *Waube v. Warrington*[2] this court, stating that it adopted the *Palsgraf* doctrine, held that where a mother saw defendant negligently run over and kill her infant daughter, she could not recover for her emotional distress and consequent illness, nor her administrator for her resulting death.

It was said, at page 613:

"The answer must be reached by balancing the social interests involved in order to ascertain how far defendant's duty and plaintiff's right may justly and expediently be extended. It is our conclusion that they can neither justly nor expediently be extended to any recovery for physical injuries sustained by one out of the range of ordinary physical peril as a result of the shock of witnessing another's danger."

In *Pfeifer v. Standard Gateway Theater*[3] however, after analyzing further the relationship of duty and cause, this court acknowledged a preference for the approach of Judge ANDREWS in *Palsgraf,* but stated:

". . . yet the majority opinion can be justified from the standpoint that judicial policy warranted the result. The conscience of society might be shocked by imposing liability in such a case."

The rule for limitation on liability for consequences of a wrongful act was stated:

[2] (1935), 216 Wis. 603, 258 N. W. 497.
[3] (1952), 262 Wis. 229, 238, 239, 55 N. W. (2d) 29.

". . . in cases so extreme that it would shock the conscience of society to impose liability, the courts may step in and hold as a matter of law that there is no liability."

As once stated by Mr. Justice HOLMES:

"The measure of the defendant's duty in determining whether a wrong has been committed is one thing, the measure of liability when a wrong has been committed is another." [4]

In *Klassa v. Milwaukee Gas Light Co.*[5] we reaffirmed the decision of the *Waube Case,* as grounded on sound considerations of public policy, pointing out again that the *Palsgraf* determination of lack of duty to plaintiff was itself a judicial determination of policy. And in *Colla v. Mandella*[6] where decedent died of a heart attack attributable to fright caused by defendant's negligence, we stated:

"In such cases it is sometimes said that the actor owed no 'duty' to the injured party; but that terminology has been criticized as begging the question. The determination to deny liability is essentially one of public policy rather than of duty or causation."

We also said, at page 598:

"It is recognized by this and other courts that even where the chain of causation is complete and direct, recovery against the negligent tort-feasor may sometimes be denied on grounds of public policy because the injury is too remote from the negligence or too 'wholly out of proportion to the culpability of the negligent tort-feasor,' or in retrospect it appears too highly extraordinary that the negligence should have brought about the harm, or because allowance of recovery would place too unreasonable a burden upon users of the highway, or be too likely to open the way to fraudulent claims, or would

[4] *Spade v. Lynn & B. R. Co.* (1899), 172 Mass. 488, 491, 52 N. E. 747, 748.
[5] (1956), 273 Wis. 176, 77 N. W. (2d) 397.
[6] (1957), 1 Wis. (2d) 594, 599, 85 N. W. (2d) 345.

'enter a field that has no sensible or just stopping point.' [Citations omitted.] In the *Pfeifer Case, supra,* we stated the essential rationale of the cases of that sort in capsule form as follows (p. 238) :

"'. . . in cases so extreme that it would shock the conscience of society to impose liability, the courts may step in and hold as a matter of law that there is no liability.'" See Campbell, Duty, Fault, and Legal Cause, 1938 Wisconsin Law Review, 402.

The public-policy determination formula of *Pfeifer, Klassa,* and *Colla* seems to us a more-realistic description of what a court does when it declines to impose liability in these situations than the *no-duty* formula of *Palsgraf* and *Waube.*

We conclude, however, that the instant case is not one for refusal to impose liability under the *Pfeifer* formula. Although it is probable that no one was aware that the warped plank was in the position and condition that it turned out to be and that water spilled on the floor would flow along it to the light fixture over the entranceway, it is not surprising that water spilled on the second floor of a building is deflected from a direct downward course by something below the floor. We do not consider that liability for personal injury resulting from the fact that the water was deflected and fell outdoors where it froze or made existing ice more slippery is wholly out of proportion to culpability for permitting the water to flow onto the floor, where a direct downward course would have resulted only in damage to merchandise.

3. *Liability of H. L. Green Company.* The floor of the entranceway was constructed of a type of tile which is slippery when wet. This was known to the store employees and they considered frequent inspections advisable. There is evidence that there were snow flurries on the particular day, and that snow had been tracked onto the floor of the entranceway, yet the evidence permits the finding that no observations were made by any employee within two hours before the accident.

If the jury believed that all the ice was formed from the water from Dr. Kliszcz's office, it could also believe that the water must have been running and the ice must have been in the process of forming for a much-longer time than Dr. Kliszcz testified. On the other hand, the jury could believe from the evidence that the water from the dentist's office was insufficient to be the source of all the ice, and that some of the ice must have been present for a long time and should have been observed by the store employees. The latter is consistent with the comparison of negligence previously referred to.

*By the Court.*—Judgment affirmed.

The following opinion was filed April 3, 1962:

PER CURIAM (*on motion for rehearing*). The special verdict returned by the jury made a comparison of the negligence of the two defendants and apportioned 70 per cent of the total aggregate negligence to defendant H. L. Green Company, and 30 per cent thereof to defendant Thomas G. Kliszcz. The judgment entered below provided for contribution between the defendants on an equal basis.

Defendant-appellant Kliszcz has filed a motion for rehearing in which he asks this court to apply the new rule on contribution, enunciated in *Bielski v. Schulze,* 16 Wis. (2d) 1, 114 N. W. (2d) 105, to those portions of the judgment which provide for contribution between the two defendants. This rule was made retroactive to all cases except those in three specified classifications. We deem that the instant case does not fall within any of these three excepted classifications.

Therefore, our prior mandate is modified to read as follows: "That part of the judgment which awards contribution to defendant H. L. Green Company is modified so as to provide that such defendant shall have judgment for contribution against defendant Kliszcz for all sums it shall pay to the plaintiff in excess of 70 per cent of the judgment

516b 

with interest. That part of the judgment which awards contribution to defendant Kliszcz is modified so as to provide that such defendant shall have judgment for contribution against defendant H. L. Green Company for all sums it shall pay to the plaintiff in excess of 30 per cent of the judgment with interest. As so modified, the judgment is affirmed."