ESTATE OF Glenn F. PLAUTZ, by Charlotte Pagel, Personal Representative, Plaintiff-Appellant-Cross Respondent,

Tracie Plautz BURKART, Allyson Plautz and Carole Plautz Hofstetter, Involuntary-Plaintiffs,

v.

TIME INSURANCE COMPANY, Defendant-Respondent-Cross Appellant,

ABC INSURANCE COMPANY, Defendant.

Court of Appeals

*No. 92–2708. Oral argument October 6, 1993.—Decided November 8, 1994.*

(Also reported in 525 N.W.2d 342.)

For the plaintiff-appellant-cross respondent and involuntary-plaintiffs the cause was submitted on the briefs of *Aiken & Scoptur, S.C.*, with *Timothy J. Aiken* and *Kelly L. Centofanti* of Milwaukee. There was oral argument by Timothy J. Aiken.

For the defendant-respondent-cross appellant the cause was submitted on the briefs of *Riordan, Crivello, Carlson, Mentkowski & Steeves, S.C.*, with *Timothy F. Mentkowski, Mary Beth Castino*, and *Barbara L. Henderson* of Milwaukee. There was oral argument by Timothy F. Mentkowski and Mary Beth Castino.

Before Wedemeyer, P.J., Fine and Schudson, JJ.

SCHUDSON, J.   With this appeal the Estate of Glenn Plautz presents an issue of first impression: whether a beneficiary/claimant under a life insurance policy can bring a bad faith claim against an insurance company following the death of the named insured. The Estate appeals from the trial court judgment entered in favor of Time Insurance Company, following a judgment notwithstanding the verdict, based on the trial court's conclusion that a life insurance beneficiary could not bring a bad faith emotional distress claim against an insurance company. We conclude, however, that such a cause of action does exist and, accordingly, we reverse the trial court's judgment notwithstanding the verdict.

In its cross-appeal, Time Insurance Company argues: (1) the Estate's suit was filed in violation of the two-year statute of limitations; (2) the trial court erroneously instructed the jury on the degree of emotional distress required in a bad faith action; (3) insufficient evidence existed to support the jury's award for emotional distress; (4) the compensatory damages award was excessive; and (5) the punitive damages award was excessive and violated Time's substantive due process rights. We conclude that Time waived any statute of limitations objection due to its failure to request that the issue be submitted to the jury. We also conclude that the omission of the word, "severe," and of any definition of "severe emotional distress" from the jury instruction was error. Additionally, we conclude that the omission of "substantial other damages" from the jury instruction on bad faith emotional distress was error. Because the errors in the jury instruction were not harmless, we reverse and remand for a new trial.[1]

---

[1] Because we reverse and remand for a new trial, we do not address the compensatory and punitive damages issues. *See*

## I. BACKGROUND

In 1964, Lois Plautz bought a $2,000 whole life insurance policy from Time, listing her husband Glenn Plautz as the beneficiary. In November 1977, Mrs. Plautz did not pay the premiums and defaulted on the policy. Because of the "extended term" provision of the policy, however, the policy did not lapse. Under that provision, the cash value of the whole-life policy paid for a term death benefit on a year-to-year basis. Because of the extended term provision, Mrs. Plautz had enough cash value to pay the premiums for coverage through 1996.

In September 1986, Mrs. Plautz converted the extended term policy back to a whole-life policy. Time calculated the remaining cash value from the extended term policy as $162.06, applied a portion of that sum to the first two years of premiums, and refunded the remainder. After the expiration of the two years' worth of pre-paid premiums, Mrs. Plautz was required to make the premium payments. In February 1988, Time sent Mrs. Plautz a premium notice advising her that she would have to pay the premium in order to keep the policy in effect. Mrs. Plautz did not pay the premium and, in April 1988, Time sent Mrs. Plautz a notice advising her that the policy had lapsed. Mrs. Plautz died in December 1988.

After Mrs. Plautz's death, Mr. Plautz took a number of insurance policies to his insurance agent, Elmer Rehse, and asked him to determine the status of the policies. On February 13, 1989, Sue Welch, a claims adjuster for Time, wrote to Rehse and advised him that the 1964 policy had been replaced by the 1986 extended

---

*Gross v. Hoffman*, 227 Wis. 296, 300, 277 N.W. 663, 665 (1938) (only dispositive issue need be addressed).

term policy, which had lapsed on March 1, 1988, because Mrs. Plautz had failed to pay the premiums.

Mr. Plautz then contacted his attorney, Doug Plier, and asked Plier to investigate Time's denial of coverage. On February 21, 1989, Plier wrote to Time, requesting documents confirming that Time had sent Mrs. Plautz a premium notice in February 1988. Welch responded, sending Plier copies of computer print-outs, which indicated that the premium notice and the lapse notice had been sent. On May 23, 1989, Plier again wrote to Time requesting a copy of the actual lapse notice and all information Time had in its file. Although the parties disputed at trial whether Time fully complied with Plier's request, Time did send Plier file materials. On August 1, 1989, Plier wrote to Time once again, seeking additional information about the calculation of the cash value. The head of Time's policy-holder services department, Robert Reindl, referred the matter to Mike Krugel, an actuary for Time. Krugel discovered that Time had made an error in calculating the Plautz policies.

According to Krugel's trial testimony, sometime between 1981 and 1986, a computer programming glitch caused Time to miscalculate the cash value of policies to the detriment of policyholders. Krugel discovered the error sometime in late 1986 or early 1987. Krugel explained that Time had no easy way to determine which policies had been affected by the glitch and he estimated that it would have taken "hundreds, if not thousands of man hours" to even attempt to determine what policies had been affected. Krugel testified that he discussed the matter with his boss and it was decided that Time would not attempt to identify the affected policies. Krugel stated that it was his experience that only about 100 extended term policies were

typically surrendered during a year and that, in his estimation the glitch would have generated, on average, only a $3 error per policy.

As it turned out, however, in Mrs. Plautz's case the error was much more. Because she kept the extended term policy for eight and one-half years instead of immediately surrendering it and obtaining the cash value, Time erroneously calculated Mrs. Plautz's remaining cash value in the extended term policy as $162.06 when, in fact, the cash value was $266.06. The $104 difference would have covered an additional year of premiums and thus would have afforded coverage at the time of Mrs. Plautz's death.

On August 29, 1989, after Time had figured out what had happened with Mrs. Plautz's policy, Welch wrote to Plier and explained that an error had been made and that Time would pay the claim. On September 15, 1989, Time mailed Mr. Plautz a check for $2,181.66 (the $2,000 death benefit, plus interest). Mr. Plautz died on November 6, 1989, but still had not cashed the check.

On July 2, 1991, the Estate of Glenn Plautz filed suit against Time.[2] On August 28, 1991, the Estate filed an amended complaint alleging bad faith in the denial of the life insurance benefits from the policy. The amended complaint also alleged bad faith emotional distress and wrongful death and sought compensatory and punitive damages.

On March 19, 1992, Time filed a motion for summary judgment, alleging, among other things, that the Estate's cause of action for bad faith was barred by the statute of limitations. The trial court denied Time's

---

[2] The parties did not litigate nor do we express an opinion on whether, under § 895.01, STATS., the bad faith cause of action survived the death of the beneficiary, Glenn Plautz.

motion and the matter proceeded to trial. Although the jury rejected the Estate's wrongful death claim, the jury did find bad faith and awarded the Estate $255,000 in compensatory damages and $2 million in punitive damages.

Both parties filed motions after verdict. The trial court granted Time's motion, concluding that a beneficiary of a life insurance policy cannot bring a bad faith claim against the insurer. The trial court did not decide any of the other arguments raised by the parties. The trial court vacated the jury verdict and dismissed the Estate's complaint with prejudice.

## II.   BAD FAITH

Although noting that there were "forceful and compelling arguments as to why Glenn ought to be able to pursue a bad faith action," the trial court nevertheless concluded that such a bad faith cause of action had not been recognized in Wisconsin. Relying on *Combined Investigative Services, Inc. v. Scottsdale Insurance Co.*, 165 Wis. 2d 262, 477 N.W.2d 82 (Ct. App. 1991), the trial court stated:

> I am satisfied that Wisconsin recognizes only three bad faith insurance actions. They are:
>
> 1.   An insured's action against the insurer for bad faith in settling with a third party claimant where the ultimate judgment exposes the insured to a judgment in excess of the policy coverage;
>
> 2.   An insured's action against the insurer for failure to satisfy the insured's nondebatable claim; and
>
> 3.   A third party's action against the insurer for failure to reimburse a workers compensation claim.

Time argues that the trial court correctly dismissed the Estate's bad faith claim because, as stated in *Kranzush v. Badger State Mutual Casualty Co.*, 103 Wis. 2d 56, 73, 307 N.W.2d 256, 265 (1981), "The insurer's duty of good faith and fair dealing arises from the insurance contract and runs to the insured." The Estate, however, argues for broader identification of the "true insured" in a life insurance contract after the named insured or policyholder dies. The Estate contends that "[i]n life insurance claims the insurance policy/application definition should not control to whom the common law duty of good faith is owed," because the primary purpose of a life insurance policy is to provide death benefits to the policyowner's beneficiaries.

At oral argument before this court, Time acknowledged the obvious problem that would exist if the policyholder or the named insured were recognized as being the only parties able to bring a bad faith case. Then, no bad faith cause of action could be brought as a result of the insurer's unreasonable handling of a claim for death benefits; technically, the deceased-named-insured or the estate of the deceased-named-insured would have suffered no damages resulting from the investigation and processing of a claim for the simple reason that the named insured was dead. Time also concluded that, under its theory, because the deceased-named-insured and its estate could not bring a bad faith action, and because the beneficiaries would not be able to bring a bad faith action, then no one could ever bring bad faith action arising out of a life insurance policy.[3]

---

[3] We limit our discussion to situations where the policyholder or named insured has died. One could foresee a bad faith cause of action by a still-living named insured or policyholder

Although Time accurately asserts that our caselaw states that bad faith arises from the contractual relationship between the insured and the insurer, *see Kranzush*, 103 Wis. 2d at 73, 307 N.W.2d at 265, and that Wisconsin courts have not yet extended bad faith beyond the three instances recognized in *Combined Investigative*, we note that previous bad faith cases did not consider the issue with respect to life insurance.[4] We conclude that a life insurance beneficiary of a deceased insured may bring a bad faith cause of action against a life insurance company for unreasonable actions in the investigation and handling of a claim.

The law in Wisconsin states that every action must be prosecuted in the name of the real party in interest.[5]

---

who met with unreasonable dealings by an insurance company in attempting to cancel or "cash-out" a life insurance policy.

[4] Thus, Time's reliance on *Kranzush v. Badger State Mutual Casualty Co.*, 103 Wis. 2d 56, 307 N.W.2d 256 (1981), is misplaced. In *Kranzush*, the supreme court held that the insured's wife, a passenger in the car the insured was driving, could not maintain a bad faith action against her husband's insurance company. The court concluded that the insurance company's duty of good faith and fair dealing ran to the insured, and that the insured's wife, a tort victim, was a third party precluded from bringing a bad faith action. *See* 103 Wis. 2d at 64-74, 307 N.W.2d at 261-265. In *Kranzush*, however, the wife, as a tort victim, stood as an adversary to her husband under the liability insurance policy. Here, by contrast, Mr. Plautz as the beneficiary of the policy his wife purchased for his benefit, succeeded to her real interest in Time's good faith.

[5] The Estate specifically argued in its brief that under the marital property statutes Glenn Plautz had an ownership interest in the policy on his wife's life and, therefore, was a proper party to bring a bad faith claim based on the delay and handling of the death benefits claim. At oral argument, however, the

145

*See* § 803.01(1) & (2), STATS. Generally, although a contract cannot be enforced by a person not a party to it, an exception exists where the contract was specifically made for the benefit of a third party. *See Abramowski v. Wm. Kilps Sons Realty, Inc.*, 80 Wis. 2d 468, 472 & n.4, 259 N.W.2d 306, 308 & n.3 (1977). Thus, a third party can recover upon a contract when the contract indicates an intention to secure a benefit to that party. *See Lorenz v. Dreske*, 62 Wis. 2d 273, 289, 214 N.W.2d 753, 761 (1974).

■ With life insurance, a named insured intentionally contracts for death benefits to be paid to designated

---

Estate relied on our recent decision, *Heyden v. Safeco Title Insurance Co.*, 175 Wis. 2d 508, 498 N.W.2d 905 (Ct. App. 1993), in which we held that the sole shareholder of a corporation insured under a title policy was a proper party to bring a bad faith action. We stated:

> The rule in Wisconsin is clear: " 'one must have an insurable interest and a loss before one can collect on a policy of insurance.' " Title to property, either legal or equitable, however, is not a prerequisite to having an "insurable interest" in that property. Rather:
>
> > A person has an insurable interest in property when the relationship between him and the property is such that he has a reasonable expectation, based upon a real or legal right, of benefit to be derived from the continued existence of the property and of loss or liability from its destruction.
> >
> > Stated another way: " 'It is sufficient if a person's relationship to the property is such that he would reasonably be expected to suffer a loss by the destruction of the property or to derive a benefit from its continued existence.' "

*Id.*, 175 Wis. 2d at 517, 498 N.W.2d at 907-908 (citations omitted). *Heyden's* requirement that a non-named-insured have an insurable interest in the subject of the insurance policy in order to be a proper party to a lawsuit is consistent with our real-party-in-interest analysis.

beneficiaries upon the named insured's death. Therefore, quite obviously, "[t]he failure to afford a cause of action for bad faith to the beneficiary of a life insurance policy would negate a substantial reason for the insured's purchase of the policy—the peace of mind and security which it provides in the event of loss." *Roach v. Atlas Life Ins. Co.*, 769 P.2d 158, 162 (Okla. 1989). As recognized in 18 COUCH ON INSURANCE § 74:327:

> The right of the beneficiary of a life policy to sue in his own name may be predicated on the real party in interest concept, for when the interest of the contingent beneficiary vests upon the death of the insured, the beneficiary is the real party in interest.
>
> The beneficiary of a policy for the benefit of whom it may concern, etc., is usually held to be the real party in interest for the purpose of bringing an action against the insurer.

(Footnotes omitted.) Accordingly, we conclude that upon the death of the insured, the beneficiary's right to the death benefit (absent a policy exclusion) and the reasonable handling of the claim contracted for by the deceased-named-insured vests.[6] Therefore, we reverse

---

[6] Our recognition of a beneficiary's bad faith cause of action is consistent with authorities from other jurisdictions and with insurance treatises that have specifically addressed the issue. *See Universal Life Ins. Co. v. Veasley*, 610 So. 2d 290, 293-294 (Miss. 1992) (insurer liable for actual damages to life insurance beneficiary as a result of unreasonable delay in payment of claim); *Roach v. Atlas Life Ins. Co.*, 769 P.2d 158, 161-162 (Okla. 1989); *Mutual Life Insurance Company of New York v. Wesson*, 517 So. 2d 521 (Miss. 1987), *cert. denied*, 486 U.S. 1043 (1988); *Gould v. Mutual Life Ins. Co. of New York*, 683 P.2d 207, 208 (Wash. Ct. App. 1984); *see also* WILLIAM M. SHERNOFF ET AL., INSURANCE BAD FAITH LITIGATION § 5.05 (1994) ("With the development of the tort of bad faith, however, the principles set out in

the trial court's judgment notwithstanding the jury's verdict that Time Insurance acted in bad faith as to Glenn Plautz.

## III. STATUTE OF LIMITATIONS ON BAD FAITH CLAIM

Time also argues that the Estate brought its bad faith claim more than two years after the cause of action, in violation of the statute of limitations for bad faith claims. *See* § 893.57, STATS. Time argued that Glenn Plautz was aware that he had been harmed once he received the denial letter in February 1989. The Estate, however, argued that the statute of limitations did not start to run until August 29, 1989, when Sue Welch informed Attorney Plier that a mistake had been made in denying the claim. The Estate filed suit against Time on July 2, 1991. Thus, the facts were disputed as to exactly when Glenn Plautz was aware or should have been aware of the probable cause of his harm; a factual question existed for the factfinder. *See Ford Farms, Ltd. v. Wisconsin Elec. Power Co.*, 145 Wis. 2d 650, 430 N.W.2d 94 (Ct. App. 1988).

other first party bad faith cases also should be applicable to claims for life insurance benefits."); 2 JOHN C. MCCARTHY, RECOVERY OF DAMAGES FOR BAD FAITH § 3.24 (5th ed. 1990) ("Under a life insurance policy, the plaintiff should be the beneficiary under the policy who is entitled to the death benefits."); 12 APPLEMAN'S INSURANCE LAW AND PRACTICE § 7004, at 48-51 (rev'd vol. 1981 and 1993 supp. at p.3) ("better rule" that insurer's duty of good faith and fair dealing "runs to all with whom the insurer has dealings," instead of just the named insured; citing *Roach*, 769 P.2d 158); 16A APPLEMAN'S INSURANCE LAW AND PRACTICE § 8878 (1993 Supp.) ("The insurer's duty of good faith and fair dealing also extends to third parties . . . such as beneficiaries of life insurance policies.").

148

Time raised its statute of limitations objection in its answer to the amended complaint and in its motion for summary judgment. The issue was also discussed during motions *in limine*. The trial court ruled that either the statute of limitations did not bar Plautz's bad faith claim or that there was a question of fact for the jury. Additionally, counsel for the Estate suggested that the issue be presented to the jury. Time, however, failed to request that the jury be given this issue, and no testimony on this issue was presented to the jury. We conclude, therefore, that Time waived any statute of limitations objection because of its failure to request that this issue be submitted to the jury. *See* § 805.13(3), STATS. (failure to object at jury instruction conference is waiver of issue).

## IV. THE JURY INSTRUCTION ON BAD FAITH EMOTIONAL DISTRESS

The parties agree on the prerequisites that a plaintiff must show in order to recover damages for emotional distress as a result of bad faith. As stated in *Anderson v. Continental Insurance Co.*, 85 Wis. 2d 675, 271 N.W.2d 368 (1978):

> A recovery for emotional distress caused by an insurer's bad faith refusal to pay an insured's claim should be allowed only when the distress is *severe* and *substantial other damage* is suffered apart from the loss of the contract benefits and the emotional distress.

*Id.*, 85 Wis. 2d at 696, 271 N.W.2d at 378 (emphasis added).

Time submitted a proposed jury instruction that mirrored the language from *Anderson*. The Estate,

149

however, submitted a proposed jury instruction that deleted the modifiers "severe" and "substantial," and read:

> The plaintiff claims that he has suffered emotional distress as a result of the bad faith of Time Insurance Company. Emotional distress resulting from bad faith is compensable if such distress was accompanied by damages aside and apart from the emotional distress itself and the damages occasioned by the breach of contract.
>
> If you are satisfied that the plaintiff suffered emotional distress and other damages, then you should include in your award a fair and reasonable allowance for the emotional distress. If you are not satisfied, make no allowance for the emotional distress and confine your award to fair and reasonable compensation only for other damages claimed by plaintiff.

The jury instruction and verdict conference was held off the record. The trial judge gave the jury the Estate's version of the bad faith emotional distress instruction. Following the jury instructions, Time renewed its objection to the deletion of the modifiers, and the trial court stated its reasoning:

> [T]he Court was of the opinion that aside from the difficulty of giving a solid definition to either one of those [modifiers], although counsel volunteered to give me thousands of examples on substantial which I politely declined.
>
> As a matter of fact, I felt that the record was sufficient to submit the question to the jury, that there was a sufficient record established, and that I didn't need the modifiers if I was going to ask them whether or not they wanted to award damages for emotional distress. That's why I took the modifiers

out. I thought there was a sufficient record to show that this was serious enough for them to consider.

Time argues that the trial court misstated the law announced in *Anderson* and that the evidence presented at trial failed to meet the criteria for bad faith emotional distress. The Estate, however, argues that inclusion of the modifiers was unnecessary and would have misled the jury, and that, in any event, any error in the jury instruction was harmless.

A trial court has broad discretion when instructing a jury, and if the trial court's instructions adequately cover the law, we will not find error in the refusal to give an instruction proposed by one of the parties, even where the proposed instruction is not erroneous. *Northwestern Nat'l Ins. Co. v. Nemetz*, 135 Wis. 2d 245, 263-264, 400 N.W.2d 33, 41 (Ct. App. 1986). Additionally, no grounds for reversal exist if we find that the overall meaning communicated by the instructions was a correct statement of the law. *White v. Leeder*, 149 Wis. 2d 948, 954-955, 440 N.W.2d 557, 559-560 (1989).

**A. "Severe" Emotional Distress.** Time argues that the omission of the word "severe" from the jury instruction misstated the law in *Anderson*. Citing WIS J I—CIVIL 2725, "Intentional Infliction of Emotional Distress," Time contends that "[t]o be 'severe' the emotional distress must be 'extreme and disabling', meaning the victim is 'unable to function in other relationships because of the emotional distress'." We agree that the omission of the term "severe" from the jury instruction was error.

*Anderson* does, in fact, specifically point out that proof of something more than "emotional distress" is required in an action for bad faith emotional distress. *Anderson* explained, "In intentional torts, substantial

other damages in addition to damages for *emotional distress* are required," and defined "emotional distress" as "an extreme disabling emotional response." *Id.*, 85 Wis. 2d at 694-695, 271 N.W.2d at 378 (emphasis added; citing *McKissick v. Schroeder*, 70 Wis. 2d 825, 235 N.W.2d 686 (1975), and *Alsteen v. Gehl*, 21 Wis. 2d 349, 124 N.W.2d 312 (1963)). Further, specifically discussing bad faith emotional distress, *Anderson* stated "that in no circumstances may a plaintiff recover for emotional distress, even when there are other accompanying damages, *unless the emotional distress is severe.*" *Id.*, 85 Wis. 2d at 696, 235 N.W.2d at 378 (emphasis added).

*Alsteen*, on which *Anderson* relied, emphatically declared that proof of "severe emotional distress" requires far more than what typically would be considered mere emotional distress:

> The plaintiff must demonstrate that he suffered an extreme disabling emotional response to the defendant's conduct. The severity of the injury is not only relevant to the *amount* of recovery, but is a necessary element to *any* recovery. The plaintiff must demonstrate that he was unable to function in his other relationships because of the emotional distress caused by defendant's conduct. Temporary discomfort cannot be the basis of recovery.

*Alsteen*, 21 Wis. 2d at 360-361, 124 N.W.2d at 318 (emphasis in original); *see also Bowen v. Lumbermens Mut. Casualty Co.*, 183 Wis. 2d 627, 652 n.23, 517 N.W.2d 432, 442 n.23 (1994) ("only where [emotional distress] is extreme . . . liability arises"); WIS J I—CIVIL 2725.

Whether Glenn Plautz's emotional distress was "severe" was for the jury to decide. The trial court failed

to instruct the jury, explicitly, that "severe emotional distress," in contrast to "emotional distress," was the element for its deliberation. Additionally, the jury instructions even failed to define "emotional distress" at all. Thus, read as a whole, the instructions did not offer any definition that, even in the absence of the word "severe," could possibly have guided the jury to the correct standard. Therefore, we conclude that the jury instructions did misstate the law.[7]

Having concluded that the jury instruction was wrong, we must determine whether the error was prejudicial; that is, whether the erroneous instruction probably misled the jury. *See Betchkal v. Willis*, 127 Wis. 2d 177, 188, 378 N.W.2d 684, 689 (1985). Stated another way, the instruction is not prejudicial if the result would not have been different had the error not occurred. *Id.* After an exacting review of the trial transcripts, we cannot conclude that the jury instruction error was harmless. We set forth the testimony from

---

[7] The Estate misleadingly suggests that *Poling v. Wisconsin Physicians Service*, 120 Wis. 2d 603, 357 N.W.2d 293 (Ct. App. 1984), required only "anxiety" to satisfy *Anderson*'s "severe emotional distress" requirement. The Estate's argument, however, relates more to the sufficiency of the evidence/harmless error analysis. Although *Poling* omitted the term "severe" from its discussion, *see id.*, 120 Wis. 2d at 609, 357 N.W.2d at 297, *Poling* cited and relied on *Anderson* in assessing the sufficiency of the evidence proving the plaintiff's "emotional distress." The *Poling* court did find that "anxiety" of the plaintiff satisfied the *Anderson* "severity" requirement, but also noted that the extent of the plaintiff's anxiety was such that the plaintiff was also taking anti-depressants. *See id.*, 120 Wis. 2d at 609-610, 357 N.W.2d at 297. Thus, in *Poling*, the plaintiff's anxiety satisfied *Anderson*'s requirement of "severe" emotional distress. *Poling* did not obliterate *Anderson*'s "severity" requirement.

the trial regarding the severity of Glenn Plautz's emotional distress allegedly caused by Time's alleged bad faith.

Dr. Fred A. Karsten, Glenn Plautz's family doctor since 1958, testified that after Lois died he happened to meet Glenn on the street when they had a five minute conversation about insurance collection issues. Dr. Karsten said that Mr. Plautz did not mention Time. Dr. Karsten stated that Plautz said that when he was paid the benefits, "he was going to be able to go a long way in getting his financial house in order." Dr. Karsten further stated:

> Glenn Plautz told me that a lot of his worries and a lot of his concerns were going to be behind him when he was paid the benefits from his wife's death. He expressed to me, and I guess for the first time even though I had known and cared for him through all the years, he spoke frankly not in detail but in general terms about the financial troubles he had.
>
> The reason that I remembered it and the reason it's so specific is because he said something to me totally out of character for Glenn. He said, "Dr. Fred, I can hardly walk down the street and look anybody in the eye anymore because I owe them so much money. And when I get these benefits, I'm going to get that out of the way."

Dr. Karsten characterized Plautz's demeanor during this five-minute conversation as "very concerned." Dr. Karsten further stated, "He was stressed, and to make the admissions that he did to me he was very concerned," "his demeanor had changed. He was anxious. He was stressed." Dr. Karsten stated, however, that he "never identified that this was in relationship to Time Insurance Company or to a sequence or either a timing of payment."

154

Dr. Karsten noted that Glenn Plautz had "some real severe health problems," including long-term alcoholism since 1960 or 1970. He said that Plautz failed to regularly take prescribed high blood pressure medicine, refused hospitalization for congestive heart failure, and refused to go to a cardiologist. Dr. Karsten also noted other stressors in Glenn Plautz's life, including financial problems unrelated to the insurance and troublesome relationships with some of his daughters.

When asked by plaintiffs' counsel whether Dr. Karsten had "an opinion as a doctor to a reasonable degree of medical probability as to whether or not denial of benefits was causing Mr. Glenn Plautz emotional distress and anxiety in the Spring and Summer of 1986 [sic]," Dr. Karsten replied, "I don't think there's any question about that medically at all." Dr. Karsten also stated that as to the Estate's wrongful death claim against Time, which the jury rejected, "had he not had that unusual experience of stress and anxiety if you will [the delay or denial of benefits], he might be alive today."

Tracy Plautz Burkart, Glenn Plautz's daughter, testified that her father was under "a lot of stress" regarding the financial problems of trying to keep his house and his business operating. Burkart explained that her mother had handled all of the couple's finances prior to her death, and that her father "had no idea what their financial situation was." Burkart also stated that her father had several sources of stress in his life, including a sister Burkart thought "was abusing" her father, and the tavern business, which was operating at a loss.

Michael A. Kasten, Glenn Plautz's brother-in-law, testified that after Lois's death he lent Glenn $750 and, during the course of the conversation surrounding the

loan, Glenn "made a statement something sort of to say that things aren't bad enough now. I'm having problems with Lois's insurance. He did not specifically say life insurance. Lois's insurance. But [Plier] is going to take care of it for me, and that was basically the end of the conversation."

Elmer Rehse, Glenn Plautz's insurance agent, testified that Plautz's overall financial picture resulted in a lot of stress and anxiety and grief.

Allyson Plautz, another of Glenn Plautz's daughters, did not give any testimony regarding the severity of her father's emotional distress. She stated that her father had been counting on the Time proceeds to pay some delinquent property taxes on the tavern, and that they had only one conversation regarding the denial by Time.

Dr. Michael Cinquergrani, Time's expert witness, detailed Glenn Plautz's bad medical condition, and stated that Glenn Plautz probably died of a heart attack. When asked "Was the delay in payment of insurance policy proceeds a factor in Glenn Plautz's death," he replied "No."

Finally, Doug Plier, Plautz's lawyer, testified that Glenn Plautz had been "having a hard time financially" and was upset by the death of his wife. Plier stated:

> Glenn expressed to me that he felt he was being cheated by Time Insurance Company because they would not pay him, and at the beginning of my working on this claim which would be, in other words, in the February area, at first I don't think it showed that much. But as time went by, when he would come into the office, I felt that there were times when he was under—seemed to be under more and more stress, for example his eyes would seem to be welled up—not—seemed to be they

would be welled up with tears. But he was a guy who would try to hold that back and generally would not permit that to show.

Plier further stated that "the welling up of the tears and stress" related to Time:

It was while we were talking about this Time Insurance claim, and part of the difficult job of being a lawyer is to tell someone that you feel they have some rights but that you can't necessarily get them their rights, and I think that was when I think it was tough on him, and I say that because of his physical facial reactions.

. . ..

. . . [I]f you're talking with a client sometimes it's tough to talk to them. You're telling them look I think you have these rights, but then you almost hate to tell them because if you can't come through on the thing then it's almost like it makes it worse; and during that period of time as we were waiting and waiting and waiting for this check to come, each time he came in he seemed more stressed, and the only issue at that time was this Time insurance. In other words, Lois was already gone, had been gone since December the 11th, so that wasn't the issue anymore. It was just this Time insurance check.

Plier stated that Glenn Plautz was relieved when he received the check from Time, but he decided not to cash the check for fear of releasing possible claims against Time. Plier stated:

His house had already been taken away. He had moved over into the tavern . . .. He had financial obligations, but there wasn't anything that was there right now that absolutely wasn't demanding the check, so I talked it over with him and he didn't cash it; and then he died.

157

Although certain portions of the testimony related to Glenn Plautz's emotional distress, it is anything but clear that the testimony established that Plautz's stress was "extreme," "disabling" and "left him unable to function in his other relationships." In the absence of any definition of the legally required standard for bad faith severe emotional distress, we cannot conclude that a different result would not have occurred had the jury been properly instructed.[8]

**B. "Substantial Other Damages."** Time argues that deletion of the modifier "substantial" from the jury instruction was error and that had the jury been properly instructed the jury would not have found this requisite to liability. Time further contends that "the only 'substantial other damages' identified by [the Estate] in this matter were some modest attorneys' fees and very minimal additional interest and penalties that Mr. Plautz incurred in April, 1989 to avoid losing his tavern in a property tax foreclosure proceeding." Time contends, "The attorneys' fees came to only $448.50 and . . . the additional interest and penalties amounted to but $21." We conclude that this aspect of the jury instruction was also error and that such error was not harmless.

*Anderson* requires that a person seeking to recover for bad faith prove "*substantial other damage* is suf-

---

[8] As part of its argument, Time contends that the question of Glenn Plautz's emotional distress never should have been submitted to the jury. Time, however, did not brief the issue of whether the trial court erred in failing to grant its motion for a directed verdict. We note also that, on appeal, Time failed to adequately develop its argument regarding causation. *See In re the Estate of Balkus*, 128 Wis. 2d 246, 255 n.5, 381 N.W.2d 593, 598 n.5 (Ct. App. 1985) (inadequately briefed issues not addressed).

fered apart from the loss of the contract benefits and the emotional distress." *Id.*, 85 Wis. 2d at 696, 271 N.W.2d at 378. *Anderson* did not define what "substantial" meant. In discussing that "substantial other damages" was required for intentional torts, however, *Anderson* cited *D.R.W. Corp. v. Cordes*, 65 Wis. 2d 303, 222 N.W.2d 671 (1974), which referred to "actual" damages and "nominal" damages. *See* 65 Wis. 2d at 309, 315-316, 222 N.W.2d at 675, 678. Thus, under *Anderson*, for bad faith emotional distress, "substantial other damages" was something more than "nominal damages." *See also Jost v. Dairyland Power Coop.*, 45 Wis. 2d 164, 171, 172 N.W.2d 647, 651 (1969) ("Substantial damages" are " 'a sum, assessed by way of damages, which is worth having; opposed to nominal damages, which are assessed to satisfy a bare legal right. Substantial damages are damages which are considerable in amount and intended as a real compensation for a real injury.' ").

In *Poling v. Wisconsin Physicians Service*, 120 Wis. 2d 603, 357 N.W.2d 293 (Ct. App. 1984), the court held that there existed sufficient evidence of "substantial other damages" apart from the damages for emotional distress and breach of contract, where the insured-husband depleted his personal assets to pay for his wife's medical care and the insured-wife had to seek public welfare medical assistance, as a result of WPS's refusal to pay the insured-couple's claims for the wife's nursing home care. *Id.*, 120 Wis. 2d at 610, 357 N.W.2d at 297. The facts in *Poling*, however, are distinguishable from this case and, further, the *Poling* case fails to state the exact dollar amounts that were at issue in that case.

The Estate contends that in *Jost v. Dairyland Power Coop.*, 45 Wis. 2d 164, 172 N.W.2d 647 (1969), the supreme court stated that $290 was "substantial

damages" as "a matter of law." *See id.*, 45 Wis. 2d at 171-172, 172 N.W.2d at 651. We do not consider *Jost* convincing on this point. The $290 at issue in *Jost* when adjusted for inflation and brought to present value would amount to approximately $1,318.18.[9] The less than $500 alleged by the Estate as "substantial other damages" does not even come close to the present value of the damages at issue in *Jost*.

■

Here, the trial court failed not only to instruct the jury that, in order to find liability, it was required to find that the damages Mr. Plautz allegedly suffered as a result of Time's bad faith apart from any breach-of-contract loss or emotional damage was "substantial," the trial court also failed to define "substantial other damages" consistent with the authority relied on by *Anderson*. In the absence of a proper instruction on this predicate to liability and based on our review of the record, we cannot conclude that a different result would not have occurred had the jury been properly instructed.

To summarize, we reverse on the appeal and conclude that a life insurance beneficiary/claimant can

---

[9] According to the consumer price index, $1 in 1994 has the purchasing power of approximately 22% of $1 in 1967. *See* Standard & Poor's Statistical Service, Current Statistics (Oct. 1994) at 12, and Basic Statistics at 76. Thus, using the following formula 1/.22=x/290 (1 representing a 1994 dollar; .22 representing the 67.4/299.8 ratio, based on Standard & Poor's, of the value of a dollar as of July 1994 and the value of a dollar in 1967 (the *Jost* date of loss); 290 representing the "substantial damages" from *Jost* and "×" representing the unknown value of what dollars would be needed today to equate $290 in 1967), the result is that the $290 from *Jost* would amount to approximately $1,318.18 today.

bring a bad faith cause of action following the death of the named insured. We also conclude that the jury instruction on bad faith emotional distress was erroneous and that such error was not harmless. Therefore, we reverse and remand for a new trial.

*By the Court.*—Judgment reversed and cause remanded with directions.

161