Anthony HICKS, Plaintiff-Respondent,

v.

Willie J. NUNNERY, Defendant-Appellant.†

Court of Appeals

*No. 01–0751. Submitted on briefs October 5, 2001.—Decided March 28, 2002.*

2002 WI App 87

(Also reported in 643 N.W.2d 809.)

† Petition to review filed.

722

729

On behalf of the plaintiff-respondent, the cause was submitted on the brief of *Jeff Scott Olson* of *The Jeff Scott Olson Law Firm, S.C.*, Madison.

Before Dykman, Roggensack and Deininger, JJ.

¶ 1. DEININGER, J.   Attorney Willie Nunnery appeals a judgment entered against him in favor of a former client, Anthony Hicks. A jury found Nunnery had been negligent in his representation of Hicks in a criminal matter, and it awarded Hicks $2,606,950 in damages. Nunnery claims that: (1) the trial court erred in failing to grant his motion for judgment notwithstanding the verdict; (2) he is entitled to judgment in his favor because Hicks failed to prove his innocence; (3) the evidence was insufficient to support the jury's answers on causation; and (4) Nunnery is

entitled to a new trial because of errors at trial or in the verdict, or alternatively, in the interests of justice.

¶ 2.  We reject all but one of Nunnery's claims of error. We conclude the trial court erred in not asking the jury to determine whether Hicks was innocent of the offenses of which he was convicted. Accordingly, we reverse the appealed judgment and remand for a trial on the limited issue of Hicks's innocence.

## BACKGROUND

¶ 3.  Hicks's legal malpractice claim arose out of Nunnery's representation of him in criminal proceedings which resulted in Hicks being convicted and imprisoned for robbery, burglary and sexual assault. We reversed Hicks's conviction in *State v. Hicks (Hicks I)*, 195 Wis. 2d 620, 536 N.W.2d 487 (Ct. App. 1995), concluding that he had been deprived of effective assistance of counsel. The supreme court affirmed our decision, but on other grounds. *State v. Hicks (Hicks II)*, 202 Wis. 2d 150, 549 N.W.2d 435 (1996) (concluding Hicks was entitled to a new trial in the interests of justice because the real controversy was not fully tried). Hicks was subsequently released after spending more than four years in prison and the State dismissed all charges against him.

¶ 4.  The following summary of background facts from the underlying criminal proceeding is largely taken from our opinion in *Hicks I*, 195 Wis. 2d at 623–29. D.F., a white female, identified Hicks as her assailant from an eight-man line-up two days after she was sexually assaulted in her apartment. At trial, D.F. testified that she heard a knock on her apartment door, looked through the peephole for approximately ten seconds, and saw a black man who told her that he was her upstairs neighbor. The man asked to use her

telephone because his was broken. D.F. let the man into her apartment after which he sexually assaulted her and robbed her of $10. According to D.F., the assailant was in her apartment between 7:25 a.m. and 7:55 a.m. D.F. also testified that, prior to this incident, no black male had ever been in her apartment and that only once, approximately one-and-one-half years before the assault, a black female had been in her apartment to borrow a blanket. Hicks stipulated that he lived in the same apartment complex as D.F., and that the two apartments were a 90–second walk from each other.

¶ 5.  The State presented testimony from a state crime laboratory analyst that, based on microscopic examination, a Negro[1] head hair found on the comforter of D.F.'s bed, and four Negro pubic hairs found when the police conducted a vacuum sweeping of the apartment approximately fifteen days after the assault, were "consistent" with samples provided by Hicks. The analyst also testified that a Caucasian head hair was found inside the pants Hicks was wearing when he was taken into custody forty-eight hours after the assault. These pants were not "sweat pants," however, which is what D.F. testified her assailant wore. The analyst testified that, based on microscopic examination, the Caucasian head hair was "consistent" with a sample provided by D.F.

¶ 6.  The analyst also explained that all Negro hair shares the same characteristics and all Caucasian hair shares the same characteristics, although not all Negro hair is identical and not all Caucasian hair is identical. She also testified that microscopic comparison of hair,

---

[1] We employ the terminology regarding the hair evidence used by witnesses during Hicks's criminal trial and postconviction proceedings, just as we and the supreme court did in the previous decisions reviewing Hicks's conviction.

unlike fingerprints, can never yield a definitive identification. She stated that to a reasonable degree of scientific certainty, the Negro and Caucasian hair specimens "could have" come from Hicks and D.F. respectively. Other than the microscopic comparisons, the State performed no other tests on the hair samples. The State performed serological testing on specimens of semen, blood and saliva obtained at the crime scene, but these tests proved inconclusive. The court granted Hicks's motion to have the semen sent to an out-of-state laboratory for DNA analysis, but the results were also inconclusive.

¶ 7. The jury found Hicks guilty and the court sentenced him to nineteen years in prison. Hicks subsequently obtained DNA testing of the hairs which had been introduced into evidence by the State during the trial. The results of the DNA testing raised questions about Hicks's guilt. Hicks then filed a motion for a new trial on the grounds of ineffective assistance of counsel, newly discovered evidence, and "in the interests of justice."

¶ 8. At the evidentiary hearing on the motion, Dr. Charlotte Word of Cellmark Diagnostics testified that the Caucasian head hair, the Negro head hair, and two of the Negro pubic hair specimens did not yield sufficient DNA for analysis. One of the two remaining pubic hair specimens, however, revealed the presence of DNA from two sources. This usually indicates, Word said, the presence of a second source of DNA on the hair shaft, such as blood, semen or saliva. Because of the presence of two sources of DNA, the test results as to this specimen were deemed inconclusive. Hicks was excluded as the source of the larger amount of DNA on this specimen, but Word could not come to a conclusion as to the fainter source.

¶ 9. The DNA from the remaining specimen was compared to the DNA extracted from Hicks's blood sample. Word testified that Hicks was excluded as the source of the DNA from this specimen. In her opinion to a reasonable degree of scientific certainty, Hicks was not the donor of this hair. Word acknowledged that this opinion was based on the assumption that the DNA on the specimen was from a single source. She also acknowledged that she could not prove the DNA was from a single source, but she stated that was the most reasonable conclusion based on several factors. In addition, she concluded there was no information to suggest it was not from a single source.

¶ 10. Nunnery testified at the hearing that he was aware that the hair samples would be a major issue in the case. Before Hicks's trial, he knew that the root tissue of hair specimens could be subjected to DNA testing at certain out-of-state laboratories, and he knew of the technology used for that testing. He did not discuss the matter with his client or with the district attorney, however, nor did he petition the court to have this test performed. When asked why he didn't pursue the testing of the hairs, Nunnery testified that he didn't do so for "strategic reasons." He also testified that, " '[o]ne reason obviously would have been costs . . . and in 20–20 hindsight may have been just a failure to further explore these other technologies in hindsight.' " *Hicks I*, 195 Wis. 2d at 629. He acknowledged that he did not explore the costs of the tests.

¶ 11. The trial court denied Hicks's motion for a new trial. The court concluded that there was no prejudice to Hicks resulting from Nunnery's failure to obtain DNA test results for trial because it was not reasonably probable that a new trial with the DNA testimony would result in a different verdict. Hicks

appealed, and this court reversed the judgment of conviction and ordered a new trial. We concluded that Hicks had received ineffective assistance of counsel because Nunnery failed to pursue available pretrial DNA testing of the hair specimens collected from D.F.'s apartment. We reasoned that there was a "probability sufficient to undermine confidence in the outcome that, but for counsel's failure to subject the hair specimens to DNA analysis, the result of the trial would have been different." *Id.* at 632.

¶ 12. On review, the Wisconsin Supreme Court affirmed our decision on the grounds that Hicks was "entitled to [a] new trial in the interests of justice." *Hicks II*, 202 Wis. 2d at 150. The court concluded that, because the hair evidence was such a critical issue at trial and the major issue in the case was identification, in view of the DNA results, "the issue of identification was not fully tried." *Id.* at 172. The State subsequently dropped all charges against Hicks, and he was released from custody after spending over four years in prison.

¶ 13. Hicks then filed a legal malpractice action against Nunnery. In his complaint, Hicks alleged that Nunnery was negligent in failing to have the hair specimens subjected to DNA analysis prior to trial and also in failing to procure testimony from a possible alibi witness. Nunnery and Hicks filed cross-motions for summary judgment, both of which were denied. A jury returned a verdict finding Nunnery negligent for both his failure to obtain DNA testing and his failure to procure the testimony of the possible alibi witness, and it awarded Hicks $2,606,950 in damages. Nunnery filed several post-verdict motions, all of which the trial court denied. Nunnery appeals the judgment against him.

## ANALYSIS

### I.

¶ 14. We first address Nunnery's claim that the trial court erred in failing to grant his motion for judgment notwithstanding the verdict (JNOV). Nunnery advances two arguments in this regard. He first argues that the three-year statute of limitations under Wis. Stat. § 893.54 (1999–2000)[2] bars Hicks's malpractice action because it was filed nearly six years after his conviction. Second, Nunnery asserts that "Hicks failed to prove a legally cognizable injury" because he did not establish "severe emotional distress," which is required in order to prevail on a claim involving the negligent infliction of emotional distress.

¶ 15. We review a trial court's denial of a motion for judgment notwithstanding the verdict de novo, applying the same standards as the trial court. *Lisa R.P. v. Michael J.W.*, 210 Wis. 2d 132, 140, 565 N.W.2d 179 (Ct. App. 1997). A motion for judgment notwithstanding the verdict accepts the findings of the verdict as true but contends that the moving party should have judgment for reasons evident in the record other than those decided by the jury. Wis. Stat. § 805.14(5)(b); *Greenlee v. Rainbow Auction/Realty Co.*, 202 Wis. 2d 653, 661, 553 N.W.2d 257 (Ct. App. 1996). The motion does not challenge the sufficiency of the evidence to support the verdict, but rather whether the facts found are sufficient to permit recovery as a matter of law. *Logterman v. Dawson*, 190 Wis. 2d 90, 101, 526 N.W.2d 768 (Ct. App. 1994).

[2] All references to the Wisconsin Statutes are to the 1999–2000 version unless otherwise noted.

¶ 16. Hicks commenced this legal malpractice action on December 9, 1997, nearly six years after his conviction on December 19, 1991. Nunnery argues that, because Hicks sought damages "primarily" for emotional distress and personal injury, his claim is governed by WIS. STAT. § 893.54.[3] That section provides a three-year limitation for bringing actions for "injuries to the person." We reject Nunnery's contention and conclude that Hicks's claim is governed by WIS. STAT. § 893.53, which allows six years to bring an action for "injury to the character or rights of another."[4]

¶ 17. The question of which statute of limitations governs a particular claim is one of law which we decide de novo. *Acharya v. Carroll*, 152 Wis. 2d 330, 335, 448 N.W.2d 275 (Ct. App. 1989). The applicability of the six-year statute of limitations under WIS. STAT. § 893.53 to legal malpractice actions is well established. *Id*. at 337. Wisconsin courts, as well as those in other jurisdictions, have concluded that legal malpractice claims do not involve "injuries to the person," as the term is used in WIS. STAT. § 893.54(1) and similar statutes, because " 'injuries to the person' connotes *bodily* injuries." *Id*. (emphasis added). Thus, "[b]ecause no other statute of limitations covers a tort action for legal

---

[3] WISCONSIN STAT. § 893.54 provides: "The following actions shall be commenced within 3 years or be barred: (1) An action to recover damages for injuries to the person. (2) An action brought to recover damages for death caused by the wrongful act, neglect or default of another."

[4] WISCONSIN STAT. § 893.53 provides: "An action to recover damages for an injury to the character or rights of another, not arising on contract, shall be commenced within 6 years after the cause of action accrues, except where a different period is expressly prescribed, or be barred."

malpractice, the six-year limitation in sec. 893.53, STATS. applies." *Id.*; *see also Hemberger v. Bitzer*, 216 Wis. 2d 509, 516, 574 N.W.2d 656 (1998).

¶ 18. Citing *Estate of Kohls v. Brah*, 57 Wis. 2d 141, 203 N.W.2d 666 (1973), Nunnery argues that the applicable statute of limitations in a malpractice action must be determined by the nature of the injuries for which damages are sought. The plaintiff decedent in *Estate of Kohls* allegedly died of aplastic anemia resulting from her treatment by two dentists. *Id.* at 143. The issue before the supreme court was whether to apply the three-year statute of limitations for "injuries to the person" or the six-year statute of limitations for contract actions to the malpractice action. The court concluded the former should apply, stating:

> While a malpractice action can be brought either in tort or in contract, it is an action to recover damages for injuries to the person. The word "action" as used in the three-year statute of limitations " . . . has reference to the subject-matter or nature thereof, not to its form as a matter of remedial procedure. Whether it be in tort or on contract, it is an action to recover damages for injuries to the person and comes alike under the terms of the statute . . . . " . . . The appellant has an option as to remedies, but, whichever route he chooses, the 'action for injuries' statute of limitations ( . . . the three-year statute) applies.

*Id.* at 144 (footnotes omitted).

¶ 19. The present action, however, alleges legal not medical malpractice, and unlike the latter, " 'legal malpractice does not cause personal injuries and, therefore, is not governed by a personal injury tort statute of limitations.' " *Acharya*, 152 Wis. 2d at 337 (citation omitted). We conclude that even though a plaintiff might plead and testify to having suffered emotional

distress on account of a lawyer's malpractice, that fact does not convert the claim into one seeking redress for "injuries to the person" (i.e., bodily injuries). The underlying injuries in a legal malpractice claim are to rights and interests of a plaintiff that go beyond, or at least are different from, injuries to his or her person under WIS. STAT. § 893.54.

¶ 20.   We thus reject Nunnery's characterization of Hicks's injuries as being "primarily" personal injuries. Hicks alleged in his complaint that "[b]ecause of [Nunnery's] unlawful actions . . . [Hicks] was criminally convicted and imprisoned, and he sustained lost wages, injury to his reputation, and mental and emotional distress, for all of which he seeks compensatory damages in an amount deemed just by the Court." Hicks's trial testimony similarly encompassed a broad range of injuries he claimed to have suffered on account of Nunnery's negligent representation.

¶ 21.   Hicks testified that his character and reputation were injured when he was labeled a convicted rapist. He said that he was harassed in prison for being a convicted rapist, and again upon his release by people in the community who would refer to him as a rapist even after all charges against him were dropped. He testified as to the impact this had on his family, including his son who was "ridiculed" at school because of Hicks's rape conviction, and he explained that he moved with his wife and children to Houston in order to escape the stigma and ridicule. Hicks also testified to losing income while in prison, and he said that his wife's wages had been garnished due to their failure to meet financial obligations during Hicks's absence. Finally, and most obviously, Hicks was deprived of his liberty during the four years of his incarceration.

¶ 22. In short, although the injuries for which Hicks sought recovery no doubt caused him emotional distress, it would be incorrect to label his claim for that reason as "primarily" one for "injuries to his person" within the meaning of WIS. STAT. § 893.54. Adopting Nunnery's position would require courts to distinguish legal malpractice claims alleging "primarily" personal-injury-type damages, such as emotional distress, from those alleging damages "primarily" of some other type. Or, as he further suggests, separate statutes of limitations might need to be applied to different elements of damages alleged in a single legal malpractice action. We conclude that adopting either approach would likely lead to confusion, inconsistency, and time-consuming litigation over limitations issues. Injuries and damages alleged in legal malpractice claims could easily be characterized in numerous ways, with differing statutes of limitations arguably applicable in what are at bottom the same cause of action. *See Wilson v. Garcia*, 471 U.S. 261, 272–75 (1985).[5]

---

[5] In holding that a single characterization should apply to all 42 U.S.C. § 1983 claims for limitations purposes, the Supreme Court in *Wilson v. Garcia*, 471 U.S. 261 (1985) stated:

> If the choice of the statute of limitations were to depend upon the particular facts or the precise legal theory of each claim, counsel could almost always argue, with considerable force, that two or more periods of limitations should apply to each § 1983 claim. Moreover, under such an approach different statutes of limitations would be applied to the various § 1983 claims arising in the same State, and multiple periods of limitations would often apply to the same case.

*Id.* at 273–74 (footnotes omitted).

¶ 23. In summary, we conclude that the fact that Hicks claimed to have suffered mental and emotional distress as a result of his conviction and confinement does not remove Hicks's legal malpractice action from the broad scope of WIS. STAT. § 893.53. The six-year statute of limitations applies to Hicks's claim against Nunnery, and the trial court did not err in denying Nunnery's JNOV motion on this ground.[6]

¶ 24. Nunnery next contends that he was entitled to JNOV because Hicks "failed to prove a legally cognizable injury." He again argues that Hicks's evidence of damages was "principally the emotional distress he claimed to suffer" as a result of his conviction and prison sentence. Nunnery claims that in order to recover any damages, it was incumbent on Hicks to prove "severe emotional distress," which, in Nunnery's view, Hicks failed to do. Nunnery cites the lack of any "psychological or psychiatric testimony submitted evidencing the development of neurosis" and the lack of "evidence of loss of function related to the emotional distress." Nunnery acknowledges that Hicks testified that he cried repeatedly while in prison, and that he feared for his own safety and that of his family during his incarceration, but notes that Hicks also testified

---

[6] Given our conclusion that WIS. STAT. § 893.53 applies to this action, we need not address Hicks's argument that even if the three-year statute of limitations applied, his action would not be barred because the period does not begin to run until his conviction was overturned. *See, e.g., Shaw v. State,* 816 P.2d 1358, 1362 (Alaska 1991) ("[W]e conclude that the statute of limitations on legal malpractice actions arising out of criminal proceedings does not begin to run until after the post-conviction relief has been obtained.").

741

that while in prison he engaged in recreation, such as playing dominos and basketball.

■■■■

¶ 25.   We accept Nunnery's assertion that in order to be directly and specifically compensable in a tort action in Wisconsin, emotional distress must be "severe." *Bowen v. Lumbermens Mut. Cas. Co.*, 183 Wis. 2d 627, 652–53, 517 N.W.2d 432 (1994). While other elements once required to recover damages for emotional distress are no longer needed (e.g., intentional infliction, a physical injury or manifestation, being in a "zone of danger"), the requirement that emotional distress be severe before any recovery may be had survives. *Id.* at 653 n.23. Many of the former impediments to a recovery for emotional distress are deemed no longer necessary to prevent fraudulent claims, but the severity requirement persists in order to ensure that life's "minor disturbances" not be occasions for lawsuits. *See id.* at 639.

¶ 26.   "Severe emotional distress" has been defined as follows:

> The plaintiff must demonstrate that he suffered an extreme disabling emotional response to the defendant's conduct. The severity of the injury is not only relevant to the *amount* of recovery, but is a necessary element to *any* recovery. The plaintiff must demonstrate that he was unable to function in his other relationships because of the emotional distress caused by defendant's conduct. Temporary discomfort cannot be the basis of recovery.

*Alsteen v. Gehl*, 21 Wis. 2d 349, 360–61, 124 N.W.2d 312 (1963). This court has explained that "severe emotional distress is anxiety of such substantial quantity or enduring quality that no reasonable person could be

expected to endure it." *Evrard v. Jacobson*, 117 Wis. 2d 69, 73, 342 N.W.2d 788 (Ct. App. 1983). Several appellate decisions note the presence of expert testimony in the record as supporting the severity of a plaintiff's emotional distress, but we are aware of none that require expert testimony as a legal prerequisite for recovery. *See, e.g., La Fleur v. Mosher*, 109 Wis. 2d 112, 114, 325 N.W.2d 314 (1982); *Estate of Plautz v. Time Ins. Co.*, 189 Wis. 2d 136, 155, 525 N.W.2d 342 (Ct. App. 1994).

¶ 27. *La Fleur* involved a fourteen-year-old girl who sued the City of La Crosse for negligent infliction of emotional distress after she was held in a jail cell for some thirteen hours without food, water and blankets. The supreme court noted that a psychiatrist had diagnosed the plaintiff "as having suffered a traumatic neurosis as a result of the confinement," *La Fleur*, 109 Wis. 2d at 114, but in reaching its conclusion that her action could be maintained even though she suffered no physical injuries, the court observed that "negligent confinement . . . . by its very nature has the special likelihood of causing real and severe emotional distress." *Id.* at 119. The court further explained that

> [b]y the very fact of confinement, under facts like those set forth here, a person's right to be free from bodily restraint is infringed. This deprivation of liberty alone, when it causes serious emotional distress, is a wrong sufficiently worthy of redress that the physical injury requirement should not be necessary. When there is a substantial and unwarranted deprivation of liberty, that deprivation itself is a sufficient guarantee that the claim is not frivolous and that "it is more probable that the plaintiff did, in fact, suffer the emotional distress alleged." It is the very nature of confinement that creates the likelihood of emotional

743

> injury. Emotional harm, in the appropriate circum-
> stances, is a reasonably foreseeable consequence of
> negligent confinement.

*Id.* at 120 (citation omitted). Thus, although the court cited the psychiatric opinion as establishing severe emotional distress, its discussion suggests that wrongful confinement in and of itself is evidence of a compensable emotional injury.

¶ 28.   We conclude, however, that it is not necessary for us to decide whether Hicks made a sufficient showing to recover damages for emotional distress because, quite simply, the jury was not asked to specify damages for emotional distress. The special verdict form included only a single, general damages question:  "What amount of money, if any, will fairly and reasonably compensate Anthony Hicks for the damages he sustained as a result of his criminal conviction and incarceration?" The relevant instruction provided little additional guidance, save for informing jurors that their answer should not be influenced by sympathy or resentment, nor by the requests made by counsel unless sustained by the evidence. *See* WIS JI—CIVIL 1700. Nunnery objected to neither the question nor the instruction, and he did not request additional instructions regarding the necessity for or a definition of "severe emotional distress."[7]

¶ 29.   During closing arguments, Hicks's counsel cited specific dollar figures for Hicks's lost wages while in prison and for the postconviction attorney fees he incurred. Counsel then discussed "the big item of damages," which he characterized as "the emotional impact on Mr. Hicks of having been wrongfully convicted of a

---

[7] *See, e.g.,* WIS JI—CIVIL 1510, 1770.

crime . . . and emotional injury to him of having spent almost five years in prison that he didn't deserve." Counsel later referred to "compensation for the humiliation and anguish of being convicted of a crime he never committed."

¶ 30.   Thus, while it is clear that the emotional impact of the consequences suffered by Hicks was a factor in the manner in which the case was tried and argued, we cannot conclude that the general damages verdict, or any identifiable subpart of it, was for "emotional distress," such that a failure to present expert testimony regarding its severity would be fatal to the verdict. The general damages award, based on the evidence and arguments presented to the jury, encompassed out-of-pocket amounts as well as non-economic losses. With regard to the latter, although some notion of "emotional distress" was undoubtedly a component of what the jury awarded, the jury was asked to compensate Hicks for the injury to his good name and reputation, and for his four-year loss of liberty, which are injuries in their own right without regard to whether they also caused Hicks emotional distress.

¶ 31.   In summary, because the jury was not asked to award damages specifically for emotional distress, and because injuries other than to Hicks's emotional well-being were established and argued to the jury, Nunnery is not entitled to a judgment notwithstanding the jury's verdict for any failure on Hicks's part to prove that he suffered severe emotional distress. Nunnery's arguments on this issue speak as much to his contention that the damages verdict was excessive, a contention we address below.

## II.

¶ 32.    We next address Nunnery's contention that we must reverse because Hicks failed to prove his innocence. Nunnery moved for summary judgment asserting, among other things, that Hicks was required to prove his innocence in order to prevail on a claim for legal malpractice arising from representation in a criminal matter. The trial court denied the motion, concluding that Hicks "need not necessarily prove that he is innocent in order to prove that, absent [Nunnery's] negligence, he would have won his case (i.e., that he would not have been convicted)." Nunnery renewed the claim in a pretrial motion and again in his post-verdict motion for a new trial. In denying the new-trial motion, the court again concluded that Wisconsin law "doesn't require that the plaintiff actually prove he was innocent in order to prevail."[8] We disagree.

¶ 33.    To prevail in an action for legal malpractice, a plaintiff must prove four elements:  (1) a lawyer-client relationship existed; (2) the defendant committed acts or omissions constituting negligence; (3) the attorney's negligence caused the plaintiff injury; and (4) the nature and extent of injury. *See Lewandowski v. Continental Cas. Co.*, 88 Wis. 2d 271, 277, 276 N.W.2d 284 (1979). The last two elements in a claim for legal malpractice arising out of civil representation most often require the plaintiff to prove a "suit within a suit"

---

[8] The verdict asked jurors to answer the following question:   "Would Anthony Hicks have been found not guilty absent the negligence of the defendant?" The court instructed the jury that it was Hicks's burden to prove that "but for the negligent acts or omissions" on Nunnery's part, Hicks "would not have been found guilty of the charges brought against him."

by showing that, " 'but for the negligence of the attorney, the client would have been successful in the prosecution or defense' " of the underlying civil action. *Id.* (citation omitted); *Cook v. Continental Cas. Co.*, 180 Wis. 2d 237, 249–50, 509 N.W.2d 100 (Ct. App. 1993). The question before us is whether the cause and injury elements for a malpractice claim stemming from legal representation in a criminal case should be defined in the same way as for representation in civil matters, or whether something more is required.

¶ 34. We are mindful that, in Wisconsin, a defendant's negligence need not be the only, or even the primary, cause of a plaintiff's injury in order for the plaintiff to recover damages. Rather, a plaintiff may recover if " 'the defendant's negligence was a substantial factor in producing the injury.' " *Morden v. Continental Ag*, 2000 WI 51, ¶ 60, 235 Wis. 2d 325, 611 N.W.2d 659 (citation omitted). The jury's finding that Hicks would have been found not guilty absent Nunnery's negligent representation establishes that Nunnery's negligence was a "cause-in-fact" of Hicks's injuries. That is not the end of the inquiry, however, inasmuch as a court must then explore whether public policy considerations may preclude the imposition of liability. *Id.* As we discuss in the paragraphs which follow, we conclude that policy considerations preclude the imposition of liability unless Hicks can establish his innocence of the charges of which he was convicted.

¶ 35. For his contention that Hicks must prove that he was innocent in order to recover on his malpractice claim, Nunnery relies, in part, on the following passage from *Harris v. Bowe*, 178 Wis. 2d 862, 505 N.W.2d 159 (Ct. App. 1993):

As noted by the supreme court: "To establish causation and injury in a legal malpractice action, the plaintiff is often compelled to prove the equivalent of two cases in a single proceeding . . . ." This requires a plaintiff to prove that, but for the negligence of the attorney, the plaintiff would have been successful in the lawsuit. In the present case, *this means that Harris had to prove that he was innocent of the first degree reckless homicide charge.* Harris, however, voluntarily pleaded guilty to the charge and, therefore, is precluded from satisfying the elements of a legal malpractice action against Bowe.

*Id.* at 868 (citations omitted, emphasis added).

¶ 36. We conclude, however, that the cited language from *Harris* is not controlling. Earlier in the *Harris* opinion we concluded that the plaintiff had not established that his defense attorney had been negligent, and it would have been unnecessary for us to go further. *See Cook*, 180 Wis. 2d at 250 ("If the jury determines that the lawyer fulfilled [the] standard of care, that ends the case."). Our consideration of whether the plaintiff in *Harris* could prove the remaining elements of a malpractice claim was thus dicta. Moreover, our focus was not on what the plaintiff in *Harris* would have had to prove at trial, but on the fact that by "voluntarily plead[ing] guilty to the charge," he was essentially estopped from alleging he was harmed by his attorney's negligence.

¶ 37. Our comments in *Harris* suggest that a plaintiff who has admitted guilt should not be heard to claim that his attorney should have obtained an acquittal, but that circumstance is not before us. Hicks has consistently maintained his innocence of the charges of which he was found guilty. The question is whether Hicks was obliged to convince the civil jurors of his

748

innocence, or, as the trial court concluded, merely to show that he would have been found not guilty at the criminal trial. The question has not been directly addressed by a Wisconsin court.[9]

¶ 38. Nunnery cites several cases from other jurisdictions which require proof of innocence in order to prove causation of injury in a legal malpractice action arising in a criminal context. For example, the Massachusetts Supreme Court in *Glenn v. Aiken*, 569 N.E.2d 783 (Mass. 1991), noted that "[c]ourts have generally required that a former criminal defendant prove his innocence of the crime charged as an element of his claim that his former trial counsel was negligent in defending him." *Id.* at 785. The court noted the distinctions between malpractice arising from representation in a criminal as opposed to a civil matter: "Not only is there the problem of differing burdens of proof, but public policy considerations also differ." *Id.* at 788. Regarding the former, the court observed that if a plaintiff's only burden is to show that the criminal jury would have acquitted, the defendant attorney is essentially faced with proving "that his former client was

---

[9] The U.S. Court of Appeals for the Seventh Circuit has concluded, relying on our comment in *Harris v. Bowe*, 178 Wis. 2d 862, 505 N.W.2d 159 (Ct. App. 1993), that Wisconsin has adopted the general rule requiring a former criminal defendant to prove innocence in order to recover on a legal malpractice claim. *Saecker v. Thorie*, 234 F.3d 1010, 1013–14 (7th Cir. 2000). The presenting issue in *Saecker*, however, involved the possible tolling of Wisconsin's six-year statute of limitations for legal malpractice, not the elements of proof of a claim for legal malpractice in a criminal context. The court's mention of a proof of innocence requirement when discussing what Wisconsin courts "might hold" with regard to the statute-of-limitations issue was thus no more dispositive in *Saecker* than it was in *Harris*.

guilty beyond a reasonable doubt," instead of persuading a jury by a preponderance of the evidence that the former client would have lost the prior action regardless of any negligent representation, as is the attorney's burden if the "suit within a suit" is a civil action. *Id.* at 787–88. On the policy issue, the court noted the commonly expressed view "that a person who has committed a crime should not be entitled to recover from his former defense counsel," which would be tantamount to "rewarding him indirectly for his crime." *Id.* at 788.

¶ 39. The California Supreme Court, in a thorough and well-reasoned opinion, reached the same result, noting that in "criminal malpractice" cases, "the clear majority of courts that have considered the question also require proof of actual innocence as an additional element." *Wiley v. County of San Diego*, 966 P.2d 983, 985 (Cal. 1998). The court discussed at length the public policy considerations for treating differently plaintiffs whose legal malpractice claims arise from representation in a criminal as opposed to a civil context. We briefly summarize some of the policy considerations we find to be persuasive and which inform our disposition of this appeal:

¶ 40. 1. " 'Permitting a convicted criminal to pursue a legal malpractice claim without requiring proof of innocence would . . . shock the public conscience, engender disrespect for courts and generally discredit the administration of justice.' " *Id.* at 986 (citation omitted).

¶ 41. 2. Allowing civil recoveries to guilty plaintiffs "impermissibly shifts responsibility for the crime away from the convict." *Id.* (citation omitted). "Regardless of the attorney's negligence, a guilty defendant's conviction and sentence are the direct consequence of

his own perfidy. . . . [Therefore,] [w]hile a conviction predicated on incompetence may be erroneous, it is not unjust." *Id.* at 987.

¶ 42.  3.  " 'Tort law provides damages only for harms to the plaintiff's legally protected interests, and the liberty of a guilty criminal is not one of them. The guilty criminal may be able to obtain an acquittal if he is skillfully represented, but he has no *right* to that result (just as he has no *right* to have the jury nullify the law, though juries sometimes do that) . . . .' " *Id.* at 990 (citations omitted).

¶ 43.  4. Even in cases where the causal link between an attorney's negligence and a client's erroneous imprisonment is most obvious (such as where the attorney fails to bring a clearly meritorious motion to suppress evidence that establishes guilt, which the state could not prove without it), civil recovery by a guilty plaintiff is not warranted because of "the nature and function of the constitutional substructure of our criminal justice system." *Id.* at 987–90. That is, such features of the criminal justice system as the state's burden to prove guilt beyond a reasonable doubt, the exclusionary rule,

> and other constitutional protections are to safeguard against conviction of the wrongly accused and to vindicate fundamental values. They are not intended to confer any direct benefit outside the context of the criminal justice system. Thus, defense counsel's negligent failure to utilize them to secure an acquittal or dismissal for a guilty defendant does not give rise to civil liability.

*Id.* at 988–89.[10]

---

[10] *See also, Carmel v. Lunney*, 511 N.E.2d 1126, 1128 (N.Y. 1987) ("[C]riminal prosecutions involve constitutional and pro-

¶ 44.   5. Unlike victims of legal malpractice in a civil context, who most often have no redress except a recovery from the negligent attorney, wrongfully convicted criminal defendants have the opportunity to rectify the wrong by asserting their Sixth Amendment right to effective assistance of counsel. *Id.* at 989. "Not only does the Constitution guarantee this right, any lapse can be rectified through an array of postconviction remedies, including appeal and habeas corpus. Such relief is afforded even to those clearly guilty as long as they demonstrate incompetence and resulting prejudice . . . ." *Id.*

¶ 45.   We find the reasoning of the California Supreme Court, and that of other courts which have reached the same result, persuasive. We cannot say the same of the reasoning of the dissent in *Wiley*, 966 P.2d at 992–94 (Mosk, J., dissenting), or that of some courts that have concluded the elements of legal malpractice should not differ regardless of whether the malpractice arises in a criminal or civil context. Some do little more than to state the conclusion with no explanation of why the policy considerations that have led many courts to adopt the "actual innocence" requirement are wrong or improper. *See, e.g., Krahn v. Kinney*, 538 N.E.2d 1058, 1061 (Ohio 1989).[11] Others discuss the issue only tan-

cedural safeguards designed to maintain the integrity of the judicial system and to protect criminal defendants from over-reaching governmental actions. These aspects of criminal proceedings make criminal malpractice cases unique, and policy considerations require different pleading and substantive rules.").

[11] The precise issue in *Krahn v. Kinney*, 538 N.E.2d 1058 (Ohio 1989), was whether the plaintiff needed to first obtain a reversal of a criminal conviction on the grounds of ineffective assistance of counsel before bringing a malpractice action

752

gentially while addressing statute-of-limitations issues. *See Gebhardt v. O'Rourke,* 510 N.W.2d 900, 905–07 (Mich. 1994).[12]

■

¶ 46.   Because we are persuaded that public policy requires a plaintiff in Hicks's position to prove he is innocent of the charges of which he was convicted in order to prevail on a claim of legal malpractice, we conclude that the trial court erred in instructing the jury that Hicks's burden was to prove only that "but for [Nunnery's] negligent acts or omissions, [Hicks] would not have been found guilty of the charges brought against him." Nunnery is thus entitled to a new trial at which Hicks must convince five-sixths of the civil ju-

---

against her former defense counsel. *Id.* at 1061. Such a requirement, sometimes labeled an "exoneration" requirement, generally involves obtaining a reversal of an erroneous criminal conviction, followed by either an acquittal or the state's dropping of charges, as a prerequisite for either filing or proving a valid legal malpractice claim arising from criminal representation. *See, e.g., Gibson v. Trant,* 58 S.W.3d 103, 108–16 (Tenn. 2001). Because Hicks obtained "exoneration" in the criminal courts before filing his malpractice claim against Nunnery, it is not necessary for us to decide whether that was a precondition to either the filing of his action or his ultimate recovery of damages from Nunnery.

[12] Whether exoneration (see note 11, above) is required before suit is commenced may impact the application of the statute of limitations. *See Gebhardt v. O'Rourke,* 510 N.W.2d 900, 905–07 (Mich. 1994). As we have discussed, because Hicks commenced his action within six years of his conviction, we need not decide whether the cause of action did not accrue until Hicks obtained a reversal of the conviction.

rors, by a preponderance of the evidence, that he did not commit the offenses of which he was convicted.[13] *See Wiley*, 966 P.2d at 991.

¶ 47.   This is not a case where an atypical series of events connects a defendant's acts or omissions to a plaintiff's harm, thereby inviting the "case-by-case," six-factor public policy analysis which the dissent concludes we should apply here. *See, e.g., Steffen v. Luecht*, 2000 WI App 56, ¶ 38, 233 Wis. 2d 475, 608 N.W.2d 713 (noting that four of the six factors "require consideration of the linkage, if any, between the negligent act and the resulting harm"). Thus, we believe that much of the dissent's discussion of "proximate cause" and "foreseeability" is irrelevant to the public policy question presented by the present facts.

¶ 48.   We also note that the adoption of a rule precluding the imposition of liability on public policy grounds for an entire class of claims is not inconsistent with Wisconsin tort law. *See, e.g., Walker v. Bignell*, 100 Wis. 2d 256, 266–67, 301 N.W.2d 447 (1981) ("[W]e . . . declare directly that, as a matter of public policy,

---

[13] Although his post-verdict motion in the circuit court regarding the "actual innocence" issue sought only a new trial on that ground, Nunnery contends on appeal that the record demonstrates conclusively that Hicks "cannot prove he is innocent." We disagree. Given the circuit court's pretrial ruling that Hicks need prove only that he would not have been found guilty, and its instructions to that effect, the "real controversy" of whether Hicks committed the offenses was not tried. We do not underestimate the difficulty facing a plaintiff in Hicks's position of attempting to "prove a negative." Nonetheless, for the reasons we have discussed, we conclude that it is his burden to do so in order to recover damages from Nunnery, and further that he should be given the opportunity to convince a properly instructed jury of his innocence.

municipalities should not be exposed to common law liability under the circumstances present in this case ['injuries caused by uncut vegetation obscuring motorists' vision at highway intersections'].". Our conclusion here is similar: as a matter of public policy, persons who actually commit the criminal offenses for which they are convicted should not be permitted to recover damages for legal malpractice from their former defense attorneys.

¶ 49. Finally, we observe that the dissent seemingly acknowledges that the "X factor" upon which, in its view, a judge should decide whether to impose or preclude liability is the probability of the plaintiff's innocence. We are much more comfortable declaring that inquiry to be a factual one, properly delegated to the jury in all cases, rather than being decided by a judge after verdict based on the judge's impression of how guilty or innocent the plaintiff appears to be. Both prospective plaintiffs and defendants will be in a better position to evaluate a potential criminal malpractice claim if it is clear from the outset that the plaintiff bears the burden of establishing actual innocence as an element of the claim, rather than leaving the outcome in all such cases to depend on "X factors."

¶ 50. We emphasize that the question of a plaintiff's innocence is in addition to, not a substitute for, a jury question regarding whether the plaintiff would have been found not guilty absent the defendant's negligence. A defendant's negligence must be found to be a cause-in-fact of the plaintiff's harm, and in the present context, this means that the attorney's negligence must still be found to have been a substantial factor contributing to the plaintiff's conviction. Although instances may be rare, it is conceivable that a jury could conclude

755

that a plaintiff did *not* commit the offense, but that he or she would nonetheless have been convicted even if properly represented at trial. This could occur, for example, where highly inculpatory evidence is presented to the criminal jury through no fault of defense counsel, and that evidence is thereafter recanted or refuted, leading the malpractice jury to conclude that the plaintiff, although innocent, would have been convicted even if counsel had not committed other, inconsequential errors unrelated to the damning evidence.[14]

¶ 51. Before addressing Nunnery's remaining claims of error regarding other aspects of the trial and verdict, we must consider whether a new trial on the issue of Hicks's innocence necessitates setting aside any other parts of the verdict. We conclude that it does not.

¶ 52. Both the trial court and this court, when ordering a new trial, are empowered to limit the issues to be retried. *Wintersberger v. Pioneer Iron & Metal Co.*, 6 Wis. 2d 69, 76, 94 N.W.2d 136 (1959) ("The power of the trial and appellate court to limit the issues on retrial is undisputed."). If a trial court orders a new trial, its decision regarding whether to limit the issues to be retried is discretionary, and we will disturb it only if discretion is erroneously exercised. *Kenwood Equip., Inc. v. Aetna Ins. Co.*, 48 Wis. 2d 472, 485, 180 N.W.2d 750 (1970). However, where a trial court has denied a post-verdict motion for a new trial, as the court did here, we may exercise our independent authority to

---

[14] This conclusion would be similar to a court concluding, on a postconviction claim of ineffective assistance of counsel, that defense counsel had performed deficiently but that the deficient performance did not prejudice the defendant. *See Strickland v. Washington*, 466 U.S. 668, 693–94 (1984).

determine whether to limit the issues on retrial. *Olson v. Milwaukee Auto. Ins. Co.*, 266 Wis. 106, 117, 62 N.W.2d 549 (1954).

¶ 53. The supreme court set out in *Kenwood* the standard for determining whether to limit issues on retrial:

> The court will generally grant a partial new trial when the error, or reason for the new trial, is confined to one issue which is entirely separable from the others and it is perfectly clear that there is no danger of complication, or where the error in a trial relates only to a certain issue which is in no way dependent for its proper trial on other issues and as to such other issues there was no error. In order that a partial new trial may be ordered, it must clearly appear that the effect of the error did not extend to all the issues tried; where it appears that the error may have affected all the issues, the conclusion of law follows that there must be a complete new trial, and, where an error, while ostensibly relating to one issue only, is of such a character as to have a prejudicial effect on the others, a full retrial should be had.

> Although an error affects one issue only, a new trial on all issues should be granted where this will best subserve the ends of justice.

*Kenwood*, 48 Wis. 2d at 485–86 (citing 66 C.J.S. *New Trial*). The supreme court applied this standard in *Just v. Misericordia Hospital*, 61 Wis. 2d 574, 582–84, 213 N.W.2d 369 (1974), and ordered a limited retrial after concluding the trial court had "abused its discretion." The court noted that "[t]he issue of causation is separable from the issue of damages and we see no danger of complication, confusion, or prejudice, if the new trial is limited to the issue of liability." *Id.* at 583.

757

¶ 54. We reach a similar conclusion here. The financial and other impacts of Hicks's conviction and imprisonment are separable from the question of whether he committed the charged offenses, and the error in the first trial affects only the latter issue. Unless the award of damages must be set aside for some other reason, a question we consider below, we see no need to retry the damages issue in order to "subserve the ends of justice." *Kenwood*, 48 Wis. 2d at 486.

¶ 55. We also conclude that the issues of Nunnery's negligence and its contribution to Hicks's conviction are separable from the question of Hicks's innocence. The questions of whether Nunnery's representation of Hicks fell below professional norms, and if so, whether the negligence was a substantial factor contributing to the guilty verdict, have no logical or direct evidentiary relationship to whether Hicks actually committed the offenses in question. The former questions focus on what Nunnery did or did not do at or before the trial in December 1991, while the latter relates exclusively to what Hicks did or did not do on November 15, 1990.

¶ 56. Accordingly, retrial is limited to the issue of whether Hicks committed the offenses of which he was convicted.

### III.

¶ 57. Nunnery next claims that the trial court erred in denying his motion to change a verdict answer or to direct a verdict in his favor. Specifically, he challenges the jury's finding that Hicks would not have been found guilty absent Nunnery's negligence. A mo-

tion for a directed verdict and one to change the jury's answer to a verdict question both challenge the sufficiency of the evidence, and neither may be granted "unless the court is satisfied that, considering all credible evidence and reasonable inferences therefrom in the light most favorable to the party against whom the motion is made, there is no credible evidence to sustain a finding in favor of such party." WIS. STAT. § 805.14(1).

¶ 58.  The foregoing standard applies to both the trial court's consideration of the motion and to this court's review on appeal. Thus, Nunnery faces the heavy burden of convincing us that there is "no credible evidence" to support the jury's finding. *Weiss v. United Fire and Cas. Co.,* 197 Wis. 2d 365, 388, 541 N.W.2d 753 (1995). Our duty is to search the record to find precisely such evidence, accepting all reasonable inferences drawn by the jury. *Heideman v. American Family Ins. Group,* 163 Wis. 2d 847, 863–64, 473 N.W.2d 14 (Ct. App. 1991). And, if we find credible evidence to support the verdict, the fact that it may arguably be " 'contradicted and the contradictory evidence be stronger and more convincing, nevertheless the verdict . . . must stand.' " *Weiss,* 197 Wis. 2d at 390 (citation omitted).

¶ 59.  Nunnery contends that Hicks failed to prove that there was a causal relationship between Nunnery's failure to obtain DNA testing of the hair evidence and Hicks's conviction. He claims that Hicks was "obligated to show to a reasonable certainty that he would have had access to [DNA] testing" and "[t]here is simply no evidence in the record that [an expert] would have actually performed . . . DNA testing on the evidence in the Hicks criminal case." We conclude, however, that there was credible evidence in the record from which

the jury could have found that the testing that was obtained postconviction was available to Nunnery and Hicks prior to the criminal trial. In an affidavit which was introduced into evidence at the malpractice trial, Nunnery admitted: (1) that he learned prior to Hicks's criminal trial that DNA testing of the hair evidence in Hicks's case could be conducted through out-of-state laboratories; (2) that he failed to have DNA testing of the root tissue of the hair samples done prior to trial; (3) that he failed to request a continuance so that he could obtain the testing; and (4) that he failed to discuss the possibilities of such testing with Hicks.

¶ 60. Dr. Word of Cellmark testified that the DNA testing was "widely known" in the scientific community prior to Hicks's criminal trial. She said that, had she been contacted by a defense attorney prior to Hicks's trial in 1991 and asked whether such testing was being done in the country for forensic purposes, she had knowledge that a laboratory in California was performing such testing at the time using a commercially available kit:

> We knew that Dr. Edward Blake, of Forensic Science Associates in Richmond, California was doing PCR testing using initially a precursor of the DQ Alpha kit and then the commercially available kit.
>
> . . . .
>
> . . . [I]t was generally known in our laboratory, since we had people that knew Ed Blake, that he was doing PCR testing. He had been actively involved in it for a number of years. He had actually testified in the first case using DQ Alpha testing I believe in either '85 or '86 in the state of Pennsylvania and had been involved in several other high profile cases, one of which being the Gary Dotson case from Illinois, which was the first case wherein post-conviction testing was

done of DNA and demonstrated that he was excluded as the individual who had committed what was alleged to be a crime at the time.

¶ 61. We thus reject Nunnery's suggestion that it was incumbent on Hicks to produce Dr. Blake to testify that he would have performed the testing in 1991 and would have testified at the criminal trial with regard to the DNA result excluding Hicks. Dr. Word's testimony regarding the availability of such testing, together with Nunnery's acknowledgement of his awareness of it, constitute credible evidence from which the jury could reasonably infer that the testing could have been obtained and introduced as evidence at the criminal trial.

¶ 62. Nunnery next argues that because the DNA test results do not positively exclude Hicks as the source of the hairs, Nunnery's failure to procure the testing prior to the criminal trial was not a cause of the criminal jury's guilty verdict. Nunnery labels Dr. Word's testimony that Hicks was excluded as the source of one of the hairs as "qualified" because her conclusion rested on the assumption that the hair came from a single source. We thus review Dr. Word's testimony in more detail.

¶ 63. She testified that all people have two "DQ Alpha types." The victim's DQ Alpha types are 1.1 and 2. Hicks's are 1.2 and 4. The DQ Alpha types of hair sample number 013 were 1.1 and 4. Thus, Hicks was excluded as the donor of this hair sample if its DNA came from a single source. Word testified that, in her opinion, to a reasonable degree of scientific certainty, the DNA in this sample did come from a single source. When questioned further, she explained that DNA was only found on the root tissue of the hair and not the shaft. Since "genetically we can only have one person be the source of a hair" and the "hair root would be the

DNA from the individual that that hair came from," Word was able to conclude that the hair was from a single source, and, given the DQ Alpha types, that person was not Hicks.

¶ 64. We thus reject Nunnery's suggestion that the "assumption" on which it was based somehow renders incredible the expert testimony that Hicks was excluded as the donor of the hair sample. To the extent the expert's opinion was "qualified," if it was that, it was a factor for the jury to consider in assessing the weight and credibility of the expert's testimony, and not a basis for a directed verdict in Nunnery's favor. *See Meurer v. ITT Gen. Controls*, 90 Wis. 2d 438, 450, 280 N.W.2d 156 (1979) ("The credibility of witnesses and the weight given to their testimony are left to the judgment of the jury . . .").

¶ 65. Nunnery also asserts that "the presence of a hair from someone other than Hicks does not prove Hicks was never in [the victim's] apartment." While this may be true, and the jury could have reached that conclusion, "where more than one reasonable inference can be drawn from the evidence, [we] must accept the inference drawn by the jury." *Id*. The victim testified at the criminal trial that, prior to the sexual assault, no other black person had been in her apartment, aside from a woman who had been there briefly two years earlier. An attorney who represented Hicks in postconviction proceedings testified at the malpractice trial that the State's case "depended incredibly upon the hairs" and that testing of the hairs would have been "extraordinarily important" as it had the potential of eliminating Hicks as the source of the hairs. We conclude that the DNA evidence excluding Hicks as a

source of the hair provided substantial evidence from which the jury in the malpractice case could reasonably infer that Hicks would not have been convicted had the evidence been introduced at Hicks's criminal trial.

■■

¶ 66.   Finally, Nunnery claims that the absence of testimony from a possible alibi witness, Tracy Connor, at the malpractice trial "is a fatal failure of proof" regarding whether Nunnery's failure to procure Connor as a witness contributed to Hicks's conviction. Nunnery argues further that even if Connor had testified at the malpractice trial, his testimony would not have established a complete alibi for Hicks, and thus would have been insufficient to establish causation of harm. However, the jury was not required to find causation with respect to both aspects of Nunnery's alleged negligence.[15] Because we conclude that the record contains sufficient evidence to support a finding that Nunnery's failure to obtain DNA testing of the hair samples was a substantial factor in producing a guilty verdict against Hicks, the jury's "yes" answer on causation must stand.

---

[15] The court instructed the jury as follows:

The plaintiff must show causation as to either act that Attorney Nunnery allegedly did or failed to do.

Specifically, as to the claim that Attorney Nunnery negligently failed to obtain hair root tissue DNA testing on the hair evidence found at the crime scene, the plaintiff must show that, but for Attorney Nunnery's failure to obtain that evidence, the plaintiff would not have been found guilty of the charges brought against him, or as to the claim that Attorney Nunnery negligently failed to obtain the testimony of Tracy Connor, the plaintiff must show that, but for Attorney Nunnery's failure to obtain that evidence, the plaintiff would not have been found guilty of the charge[s] against him, or plaintiff must show that but for the combination of these failures the plaintiff would have been found not guilty of the charges against him.

We need not decide, therefore, whether Nunnery's failure to procure Connor's testimony also contributed to the criminal jury's guilty verdict.

## IV.

¶ 67.    Nunnery concludes his appeal with a series of arguments claiming his entitlement to a new trial, but none persuades us to grant one on the cited grounds. He first claims that the verdict is "perverse," but the basis for this claim is essentially that the damages award was excessive, which is the second basis he alleges warrants a new trial. We reject both claims. The trial court refused to reduce the damages awarded or to order a new trial because of an excessive award, and it was in a better position than we to evaluate the award and the evidence supporting it. The supreme court has explained the standard for our review:

> Where in response to motions after verdict a trial court fully reviews the evidence as to damages and concludes that the award is or is not excessive, the sole question on appellate review is whether this determination was an abuse of discretion. On review this court must, like the trial court, view the evidence in the light most favorable to the plaintiff. Where the trial court's analysis of the evidence upon which it approves or rejects a jury's damage award is complete, the reviewing court need not review the entire record as a matter of first impression and ascertain whether, in its judgment, the verdict is excessive. Instead, this court will review the evidence only to the extent necessary to determine whether the trial court abused its discretion.

*Koele v. Radue*, 81 Wis. 2d 583, 587, 260 N.W.2d 766 (1978) (footnotes omitted).

¶ 68.    The trial court's ruling denying Nunnery's challenge to the damage award included the following comments:

764

That brings us to the damage question, and this, in my opinion, is the hardest question of all. The questions are does the award of $2.6 million reflect a rate of compensation that's beyond reason and does it shock the conscience by its lack of any relationship to the evidence established at trial. Frankly, I'm shocked, and I don't know whether I can separate whether I'm shocked as a person or shocked as a judge. I have to tell you I've been shocked for quite some time over the seemingly outrageous rates of compensation that various people in this society earn .... The law is clear. Just because I disagree with a verdict, that doesn't give me the authority to modify it.

. . . .

The verdict that was returned here, again regardless of whether or not I agree with it, it does have some relationship to the evidence at trial ....

Now, the burden that's placed upon the circuit court when considering whether or not a claim is an excessive verdict is substantial. Excessiveness alone is not sufficient to label a verdict perverse, and I have searched the record for a reasonable basis to support the damage award. The record establishes that the plaintiff was convicted of the sexual assault. He was imprisoned for four-and-a-half years. He feared being assaulted in prison although he never was. He worried about his family. He suffered no physical injuries. He offered no medical or psychiatric or psychological testimony to support the damages, and he offered no testimony from his wife or his children, his father, or friends to support the damages. Significantly the testimony from his mother dealt with the damage issue as much as the — that is the wage loss as much as anything else. The plaintiff also testified that after his release, he's enjoyed a stable family life and successful employment.

Certainly the evidence as to damages is imprecise, and an award of $2.6 million is, in all likelihood, higher than I would have awarded. However, the plaintiff has suffered by his imprisonment. It was four-and-a-half years, and strange as it may sound, that's temporary. He was temporarily imprisoned. There's no testimony in this record as to permanency. This was, all in all, a serious deprivation that was suffered by the plaintiff, and obviously it should be compensated, and that compensation should reflect upon the reality of the plaintiff's life before, during, and after incarceration.

If I'm to upset this award of damages, I have to find either that they're so excessive as to indicate that they resulted from passion, prejudice, or a corruption — I can't do that — or I have to find that the jury disregarded the evidence or the applicable rules of law. I can't find that the jury disregarded the evidence or any applicable rules of law. I can't find that there was erroneous jury instructions given as to the proper measure of damages. This is just not the case, and I have, believe me, I have dwelt long and hard . . . .

¶ 69.  We conclude the trial court did not erroneously exercise its discretion in refusing to grant Nunnery relief from the damages award. While the size of the verdict gives us pause, just as it did the trial court, we, like that court, may not substitute our judgment for that of the jury. We conclude that there is credible evidence to support the award, and that the trial court's analysis of the record was "complete." *See Koele*, 81 Wis. 2d at 587.

¶ 70.  Nunnery's next basis for requesting a new trial is that, even if there was "credible evidence" to support the jury's answer on the causation question, the "yes" answer was still contrary to the great weight of the

evidence. This claim of error involves the same evidence we have already reviewed, but a different balance point for our review applies. We nonetheless conclude that the jury's finding that Hicks would not have been found guilty absent Nunnery's negligence in failing to obtain DNA testing was not greatly outweighed by evidence to the contrary. The trial court therefore did not err in denying Nunnery a new trial on this ground.

¶ 71. Next, Nunnery cites what he claims were two "prejudicial errors" which require the entire case to be retried. The first is that the trial court admitted Nunnery's "mea culpa" affidavit from Hicks's postconviction ineffective assistance of counsel proceedings as evidence during the malpractice trial. Nunnery claims this was error because, "[t]o promote full representation of the client in the underlying criminal action and the cooperation of the attorney in that representation, good public policy and Wis. Stat. § 904.03 dictate that admissions made by an attorney as to the attorney's errors be excluded from any subsequent malpractice proceeding." Nunnery further alleges that "allowing the use of such admissions would have a chilling effect on criminal defense counsel, seriously inhibiting the vigorous representation of their clients post-trial." We disagree.

¶ 72. We first note that when a former client files a claim of ineffective assistance of counsel, the allegedly deficient attorney is relieved of his or her obligation of confidentiality regarding past attorney-client communications, "to the extent the lawyer reasonably believes necessary . . . to respond to allegations . . . concerning the lawyer's representation of the client." SCR 20:1.6(c)(2) (2002); *State v. Flores*, 170 Wis. 2d 272, 277–78, 488 N.W.2d 116 (Ct. App. 1992). All attorneys, moreover, are obligated to testify truthfully at all times,

*see* SCR 20:3.3(a)(1) (2002), including when they are confronted with allegations of ineffective assistance of counsel. We therefore question Nunnery's premise that an attorney when facing a former client's allegations of ineffective assistance of counsel remains under a duty to "vigorously represent" the former client.[16] Rather, the attorney's duty is to testify truthfully regarding his or her representation of the former client, so that the criminal court can properly evaluate the defendant's Sixth Amendment claim.

¶ 73. Accordingly, we see no reason why testimony an attorney might give during postconviction proceedings should be inadmissible in a subsequent malpractice trial. As we have discussed, the attorney is obligated to speak the truth in both proceedings, regardless of whether the testimony in the former may ultimately be against the attorney's interests in the latter. On balance, we conclude that the better public policy is to treat attorneys no differently than other witnesses whose sworn statements may later be introduced as admissions against them.[17]

---

[16] We note that Nunnery apparently continued to serve as co-counsel for Hicks during postconviction proceedings, notwithstanding the fact that Hicks was pursuing relief on the grounds of Nunnery's ineffective assistance at trial. We believe that continued representation under these circumstances is rare, and in the vast majority of cases where ineffective assistance of counsel is alleged, the allegedly deficient attorney no longer represents the defendant.

[17] We are aware of concerns expressed in some quarters that are the exact opposite of the policy arguments Nunnery advances here. According to some, criminal defense attorneys will too often readily admit to deficiencies in their representation during postconviction proceedings, perhaps out of regret

¶ 74. Nunnery also complains of a trial court ruling that prevented him from introducing certain testimony given by Tracy Connor during the criminal postconviction proceedings. Nunnery claims the testimony, although hearsay, was admissible under WIS. STAT. § 908.03(24), and that it would have assisted him in impeaching Hicks's trial testimony regarding Hicks's whereabouts on the day of the offenses. We have reviewed the trial court's ruling on this issue, and it does not appear that Nunnery sought admission on the basis of "comparable circumstantial guarantees of trustworthiness," the basis he now cites. Moreover, we conclude that the value of the evidence for impeachment purposes was minimal, in that the discrepancy dealt with where Connor and Hicks had intended to meet, a discrepancy that was previously established through other testimony. We conclude that the court's ruling, even if erroneous, did not affect any "substantial right" of Nunnery's. *See* WIS. STAT. § 901.03(1).

¶ 75. Finally, Nunnery asks us to reverse and grant a new trial in the "interests of justice." His cursory argument in support of this request simply refers to his prior claims of error. We have rejected those claims, save one. Except for the need to try the issue of Hicks's actual innocence, we find the jury's verdict sustainable. We find no basis in the record to grant a new trial in the interests of justice.

over a less than desirable outcome or a sense of continuing loyalty to their former clients. We do not necessarily share this concern, but note only that it exists.

## CONCLUSION

¶ 76. For the reasons discussed, we reverse the appealed judgment and remand for a trial at which Hicks must establish that he did not commit the offenses of which he was convicted. If the jury finds by a preponderance of the evidence that Hicks did not commit the offenses, the judgment in Hicks's favor shall be reinstated.

*By the Court.*—Judgment reversed and cause remanded with directions.

¶ 77. DYKMAN, J. (*dissenting*). It started with *Palsgraf v. Long Island Railroad Co.*, 162 N.E. 99 (1928), a case read by every first-year law student.[1] *Palsgraf* is one of those cases that bring an issue into sharp focus. Everyone knows of Mrs. Palsgraf, who was standing at a distance from where a passenger, assisted by two employees of the railroad, was boarding a train. *Id.* at 99. The employee accidentally knocked a package from the passenger's hand. *Id.* The package, which turned out to contain fireworks, fell to the tracks below and exploded. *Id.* The explosion knocked over some scales, which struck and injured Mrs. Palsgraf. *Id.*

¶ 78. Justice Cardozo, writing for the majority, concluded that Mrs. Palsgraf couldn't recover from the railroad company because it was not negligent as to Mrs. Palsgraf. *Id.* Justice Andrews, in his dissent,

---

[1] The crux of this dissent is that the majority has failed to properly apply Wisconsin's long-standing, unique tort methodology in considering whether public policy dictates that Hicks prove actual innocence at trial. As a result, I believe it is necessary to trace the development of that law in Wisconsin in order to fully explain where the majority went wrong and why it is inappropriate to follow a rule applied in other states that approach tort law in ways that are alien to Wisconsin.

concluded that the issue was whether the accident was proximately caused by the employee. *Id.* at 102. He concluded that it was, and would have permitted Mrs. Palsgraf to recover from the railroad. *Id.* at 105.

¶ 79. *Palsgraf* was a hard case, because, while most people would agree that liability should end somewhere, the explanation for the stopping place was unclear. Justice Cardozo and Justice Andrews had two different methods of describing the place where liability stopped. And each state would have to decide how to deal with difficult cases where negligence or an intentional tort existed, but the connection between the plaintiff and the defendant was tenuous.

¶ 80. Wisconsin entered the picture a few years later with *Osborne v. Montgomery*, 203 Wis. 223, 234 N.W. 372 (1931). The court recognized the problem of dealing with this area when it said: "In a consideration of this subject it is easy to get lost in a maze of metaphysical distinctions, or perhaps it may better be said it is difficult not to be so lost." *Id.* at 231. The court concluded: "Any rule which operates to limit liability for a wrongful act must be derived from judicial policy and its limits cannot be defined by any formula capable of automatic application but which must rest in the sound discretion of the court." *Id.* at 237. After some backtracking, this rule was solidified in *Pfeifer v. Standard Gateway Theater, Inc.*, 262 Wis. 229, 55 N.W.2d 29 (1952). In *Pfeifer*, the court reasserted its holding in *Osborne*, noting:

> It would seem to be preferable to submit these hard cases to the jury in so far as determining the issues of negligence and causation in the same manner as in the ordinary case. If the jury does determine that there was negligence, and that such negligence was a substantial factor in producing the injury, it is then for the court to

decide as a matter of law whether or not considerations of public policy require that there be no liability. As previously pointed out, this latter solution is the one advanced in *Osborne v. Montgomery, supra,* and we adhere thereto. It is also in accord with the views expressed by Professor Campbell in his article in 1938 Wisconsin Law Review, 402, and with Restatement, 2 Torts (1948 Supp.), p. 739, sec. 435, 2, comment *e,* thereunder.

*Pfeifer,* 262 Wis. at 240.

¶ 81.   Professor Richard Campbell has had a profound influence on the way the Wisconsin Supreme Court has viewed torts, and in particular, the proper method of analyzing issues of duty, causation, damages and of policy factors which preclude liability. His various articles in the Wisconsin Law Review and elsewhere have been cited favorably by the court on twenty-one occasions. In 1938, Professor Campbell examined the use of the term "proximate cause," and the problems inherent in the use of that term. RICHARD V. CAMPBELL, *Duty, Fault and Legal Cause,* 1938 WIS. L. REV. 402 (1938). He observed that the use of that term has been confusing, because it described two very different concepts:

> The term "proximate cause" has been commonly used to describe limitations on liability and on the extent of liability based on (1) lack of causal connection in fact, and (2) policy factors making it unfair to hold the party. Experience has demonstrated that the name was an unfortunate selection. Its use has tended to confuse the issues in much the same way that the phrase "res ipsa loquitur" has hampered the normal use of presumptions and circumstantial evidence in the proof of negligence. The word "proximate" has unduly emphasized one out of a variety of factors. Associating it with the word "cause" has tended to confuse two

distinct issues. In an article in 1912, Professor Jeremiah Smith suggested the use of the term "substantial factor". . . . This dissatisfaction with "proximate cause" may produce a more expressive terminology and possibly a more logical procedure. But it must be remembered that fundamental questions are not usually solved by words. Any word or set of words will work if their meaning is a matter of common knowledge.

*Id.* at 403.

¶ 82. In 1941, Professor Campbell noted that Wisconsin had developed two lines of authority that were fundamentally inconsistent in their administration of rules of proximate cause. *See* RICHARD V. CAMPBELL, *Torts,* 1941 WIS. L. REV. 110, 113 (1941). By 1962, Professor Campbell had concluded that:

> It is now clear that we are administering two distinct issues under the label "proximate cause." One is the issue of cause in fact. This issue is for the jury, subject to the usual controls by the judge in passing on the sufficiency of the evidence. The other issue is purely one of the policy of the law. It is exclusively for the judge. It is not clear how to describe these completely separate issues by the use of this single term. The matter is further complicated by the past associations which surround it.

RICHARD V. CAMPBELL, *Wisconsin Law Governing Automobile Accidents—Part I,* 1962 WIS. L. REV. 240, 266–67 (1962).

¶ 83. In sum, Professor Campbell believed that "[t]he term 'proximate cause' has outlived its usefulness" and recommended an appropriate course of action: "Various legal terms have been selected for the firing squad. I nominate 'proximate cause.' " *Id.*

¶ 84. In 1969, Professor Campbell presented a series of four lectures on tort law in Wisconsin. The

lectures were compiled in RICHARD V. CAMPBELL, RECENT DEVELOPMENTS OF TORT LAW IN WISCONSIN (1969). By this time, Professor Campbell had concluded that the proper term for cause in fact, as used in the popular sense, was "substantial factor." It was therefore immaterial how unnatural the result is if, in fact, the negligence was a substantial factor in causing the injury. In discussing policy or "X" factors, Professor Campbell wrote:

> Delimiting policy factor principles have been the source of considerable confusion in tort law. Much of this has been corrected in recent years since we have sharply distinguished issues of cause in fact and delimiting policy factors. The *Pfeifer* case set the standard for Wisconsin. This issue is exclusively for the court and the test is whether it will shock the conscience of society to hold the defendant. In explaining the *Pfeifer* approach, in 1962, in *Longberg v. H. L. Green Co.*, 15 Wis.2d 505, 113 N.W.2d 129, 114 N.W2d 435 (1962), our court said "The public-policy determination of *Pfeifer*, *Klassa*, and *Colla* seems to us a more realistic description of what a court does when it declines to impose liability in these situations than the *no-duty* formula of *Palsgraf* and *Waube*."

> We have settled our approach to the issue. Of course, this does not automatically solve all of the cases. It does, nevertheless, prevent us from making mistakes in cases which are mine-run on this question. This means 99% or more of our total negligence litigation . . . .

> This still leaves the hard cases. We should not disregard earlier authorities simply because they were decided before 1952, the date of the *Pfeifer* decision. Although the *Restatement of Torts* analysis of this subject differs substantially from that in Wisconsin, it does not mean we should disregard the *Restatement* in

774

answering individual cases. The value of material in the *Torts Restatement* is illustrated by the decisions of *Diener v. Heritage Mutual Insurance Co.*, 37 Wis.2d 411, 155 N.W.2d 37 (1967) and *Johnson v. Chemical Supply Co.*, 38 Wis.2d 194, 156 N.W.2d 455 (1968). In each instance the analysis resulted in recovery by the plaintiff.

*Id.* at 54–55 (emphasis added).

¶ 85.   In conclusion, Professor Campbell noted:

It is my opinion that tort law today in Wisconsin is on a more sound basis than tort law in any other state in the United States . . . . [A]s I study tort decisions, I am constantly amazed and appalled at what I find around the country. It is easy to understand why some people in some parts of the United States feel that any change is bound to be an improvement.

. . . [B]y and large, I am convinced that our supreme court has done an excellent job in molding the common law of torts in this state.

*Id.* at 121–22.

¶ 86.   The genius of Professor Campbell's view of torts is its simplicity. This view makes tort law as easy as A, B, C, D and X. A is duty, B is breach, C is cause in fact, D is damages and X is policy factors. In Wisconsin, everyone owes a duty to all others to refrain from any act which will cause foreseeable harm to others. *Dixson v. Wisconsin Health Org. Ins. Corp.*, 2000 WI 95, ¶ 22, 237 Wis. 2d 149, 612 N.W.2d 721 (2000). The breach of a duty constitutes negligence. *Ramsden v. Farm Credit Serv. of N. Cent. Wis.*, 223 Wis. 2d 704, 714, 590 N.W.2d 1 (Ct. App. 1998). A cause is any "substantial factor" that produces the injury. *Pfeifer*, 262 Wis. at 273. Damages are pecuniary compensation for loss or injury. *Wisconsin Pub. Serv. Corp. v. Heritage Mut. Ins. Co.*,

200 Wis. 2d 821, 831, 548 N.W.2d 544 (Ct. App. 1996). If these factors are determined in favor of a plaintiff, most cases end here, with a judgment for the plaintiff. In the hard cases, judges determine whether policy factors will prevent liability notwithstanding a plaintiff's success in proving negligence, causation and damages. What makes this analysis easy and workable is that judges analyzing policy factors do so on a case-by-case basis. There is no "one size fits all" rule which would lead to unfortunate results and exceptions upon exceptions in individual cases. This "case-by-case" rule is universally used, and is firmly entrenched in Wisconsin case law. *See Bowen v. Lumbermens Mut. Cas. Co.*, 183 Wis. 2d 627, 650–51, 517 N.W.2d 432 (1994); *Garrett v. City of New Berlin*, 122 Wis. 2d 223, 242, 362 N.W.2d 137 (1985); *Alwin v. State Farm Fire & Cas. Co.*, 2000 WI App 92, ¶ 12, 234 Wis. 2d 441, 610 N.W.2d 218; *Sussex Tool & Supply v. Mainline Sewer & Water, Inc.*, 231 Wis. 2d 404, 418, 605 N.W.2d 620 (Ct. App. 1999).

¶ 87. This view clearly differentiates between the factual issues to be determined by a jury and the policy issues to be decided by judges. Other states, particularly those which continue to struggle with "proximate cause" and its multiple meanings, are not so lucky. While we see discussions in other states' appellate opinions of policy issues which operate to delimit recovery, use of the term "proximate cause" can place policy decisions in the hands of a jury. In Professor Campbell's view, and in mine, that is an unfortunate way of determining the public policy of any state.

¶ 88. How would Professor Campbell view Wisconsin's tort law analysis were he here to examine it today? Probably not as optimistically as he did in 1969, though most of the time, Wisconsin courts follow analyses that do not clash with his core teachings. While the

term "proximate cause" has not been put to the firing squad, those unfortunate words have been described as "abandoned." The court did so in *Blashaski v. Classified Risk Insurance Corp.*, 48 Wis. 2d 169, 174–75, 179 N.W.2d 924 (1970):

> The doctrine of proximate cause in the strict sense of that term has been abandoned for the substantial-factor concept of causation to properly express "legal cause" or "cause." *Osborne v. Montgomery* (1931), 203 Wis. 223, 236, 234 N. W. 372; *Pfeifer v. Standard Gateway Theater, Inc.* (1952), 262 Wis. 229, 55 N. W. 2d 29.

¶ 89.   This comment was repeated in *Sampson v. Laskin*, 66 Wis. 2d 318, 325, 224 N.W.2d 594 (1975); *Miles v. Ace Van Lines & Movers, Inc.*, 72 Wis. 2d 538, 542, 241 N.W.2d 186 (1976); and *Rixmann v. Somerset Public Schools*, 83 Wis. 2d 571, 585, 266 N.W.2d 326 (1978). And in *Sorensen v. Jarvis*, 119 Wis. 2d 627, 641, 350 N.W.2d 108 (1984), the court referred to "the outmoded concept of proximate cause." More recently, the court of appeals noted that "proximate cause" had been abandoned in *Pfeifer*. *See Eckes v. Keith*, 143 Wis. 2d 209, 211, 420 N.W.2d 417 (Ct. App. 1988); *see also Young v. Professionals Ins. Co.*, 154 Wis. 2d 742, 749, 454 N.W.2d 24. (Ct. App. 1990).

¶ 90.   However, notwithstanding the court's rejection of "proximate cause" in Wisconsin, the phrase has had a considerable life of its own. Professor Campbell's observation that those words describe two distinct issues, resulting in confusion as to which meaning is meant, is dramatically shown in the cases that use this term. A search of about half of the 344 published cases which use the phrase "proximate cause" reveals that in the most benign use of "proximate cause," courts are using the phrase as a synonym for the policy or "X"

factors that courts may use to negate liability after a jury concludes that a defendant breached a duty, causing damages to a plaintiff.[2] *See Brockmeyer v. Dun & Bradstreet*, 113 Wis. 2d 561, 575, 335 N.W.2d 834 (1985) (only limitations on liability are those of "proximate cause" or public policy considerations); *Sanem v. Home Ins. Co.*, 119 Wis. 2d 530, 538, 350 N.W.2d 89 (1984) ("proximate cause" involves public policy considerations and is a question of law); *Widell v. Tollefson*, 158 Wis. 2d 674, 682, 462 N.W.2d 910 (Ct. App. 1990) (determination of "proximate cause" through evaluation of public policy considerations is a question of law); *Reiman Associates, Inc. v. R/A Advertising, Inc.*, 102 Wis. 2d 305, 321 n.11, 306 N.W.2d 292 (Ct. App. 1981) ("proximate cause" equivalent of policy considerations).

¶ 91.  However, even a relatively benign use of "proximate cause" as a synonym for "X" or policy factors is confusing. Several of the six examples of policy factors Wisconsin has identified have no relationship to "cause" or proximateness. In *Miller v. Wal-Mart Stores, Inc.*, 219 Wis. 2d 250, 264–65, 580 N.W.2d 233 (1998), the court examined these factors:

(1) The injury is too remote from the negligence; or (2) the injury is too wholly out of proportion to the culpability of the negligent tort-feasor; or (3) in retrospect it appears too highly extraordinary that the negligence should have brought about the harm; or (4) because allowance of recovery would place too unreasonable a burden on the negligent tort-feasor; or (5) because allowance of recovery would be too likely to open the

[2] There are more than 344 cases using the phrase "proximate cause." But the search data included only cases decided from 1939 to date.

way for fraudulent claims; or (6) allowance of recovery would enter a field that has no sensible or just stopping point.

¶ 92.    The first factor, an injury that is too remote from the negligence, is the factor Justice Andrews used in his dissent in *Palsgraf* to limit recovery, though he concluded that it did not apply in that case. But it is difficult to explain why the phrase "proximate cause" would identify the concept of a recovery being too likely to open the way for fraudulent claims or that allowance of recovery would enter a field that has no sensible or just stopping point. While "proximate cause" reasonably describes remoteness from negligence, it is only confusing when using it to describe some of the other factors Wisconsin uses to limit liability.

¶ 93.    There is no reason why the concept of policy reasons negating liability as a matter of law cannot be described by almost any word or phrase. But it is unfortunate that we have at times used the phrase "proximate cause" to describe this concept because the word "cause" is the same word used earlier in our torts analysis. "Proximate cause" can be and is confused with the words "cause" or "cause in fact," words used to describe a relationship that a jury is directed to consider when determining whether an actor is negligent. This is the reason Professor Campbell suggested that "proximate cause" was a term that has "outlived its usefulness" and should be selected for the firing squad. I agree.

¶ 94.    But the situation is far worse than the use of an unfortunate term to describe a concept. A significant number of cases using the phrase "proximate cause" use it not to describe the concept of policy factors which negate liability, but to incorrectly equate proximate cause with a number of other concepts. For instance, in

779

*City of Milwaukee v. Allied Smelting Corp.*, 117 Wis. 2d 377, 387, 344 N.W.2d 523 (Ct. App. 1983), we wrote: "[W]e hold that the trial court was correct in attributing negligence and proximate cause to Allied." It is apparent that in *City of Milwaukee*, we confused "proximate cause" with cause in fact. A court does not "attribute" proximate cause to a litigant. Instead, a court concludes that for policy reasons, a plaintiff cannot prevail. And in *Jones v. Dane County*, 195 Wis. 2d 892, 537 N.W.2d 74 (Ct. App. 1995), the dissent concluded: "That court prescribed an instruction on proximate or legal cause which rejected the use of the term 'proximate cause' in favor of 'substantial factor.' " *Id.* at 966 (Sundby, J., dissenting). This is contrary to what the supreme court had done in *Osborne* and *Pfeifer*. As the cases I have cited explain, these two terms are not synonymous, but describe two different concepts, one of which is decided by judges, and the other by juries.

¶ 95. In *Smith v. State Farm Fire & Casualty Co.*, 192 Wis. 2d 322, 333, 531 N.W.2d 376 (Ct. App. 1995), we said that a causal connection was not of the type "which would ordinarily be necessary to warrant a finding of 'proximate cause' or 'substantial factor' as those terms are used in imposing liability." But "proximate cause," if used to describe "X" or policy factors, does not impose liability, it prevents liability. We confused "proximate cause" with "cause" or "cause in fact" in *Smith*. In *Cook v. Continental Casualty Co.*, 180 Wis. 2d 237, 249, 509 N.W.2d 100 (Ct. App. 1993), we said: "Upon remand, Cook must prove not only that Hupy was negligent, but that the negligence was the proximate cause of the injury . . . ." Assuming that we used "proximate cause" to mean policy or "X" factors, "proximate cause" is not something a plaintiff must

prove, but a limiting factor on a plaintiff's recovery. Again, we confused "proximate cause" with "cause."

¶ 96. The problem is sometimes brought about when the context of the case is unusual. An example of this is *State v. Asfoor*, 75 Wis. 2d 411, 249 N.W.2d 529 (1977), a criminal case which nonetheless dealt with negligence. The court concluded: "The question is whether the defendant's acts were a proximate cause of the victim's injuries. That is a question for the jury." *Id.* at 434. But "proximate cause," even if used in its most benign form as a synonym for policy or "X" factors, is a matter for a court to decide. We do not let a jury decide policy factors. This problem has occurred in a civil case, *Johnson v. Heintz*, 73 Wis. 2d 286, 303, 243 N.W.2d 815 (1976): "Such negligence could also have been found by the jury to thus be a proximate cause of the second impact of the Heintz vehicle . . . ."

¶ 97. To confuse the matter further, "legal cause" is sometimes substituted for "proximate cause." *Bowen*, 183 Wis. 2d at 654. And "legal cause" is sometimes used to describe a combination of factors, one of which is a jury question and the other a matter for the court. "In negligence cases, legal cause consists of two parts: cause-in-fact and "proximate cause." *McMahon v. St. Croix Falls Sch. Dist.*, 228 Wis. 2d 215, 223, 596 N.W.2d 875 (Ct. App. 1999). This is despite "legal cause" being used as a synonym for "proximate cause." We used "legal cause" to mean "cause in fact" in *State v. Benzel*, 220 Wis. 2d 588, 592, 583 N.W.2d 434 (Ct. App. 1998): "It follows that an offense created by an unconstitutional statute is no longer a crime and a conviction under such a statute cannot be a legal cause for imprisonment." *See also Clark v. Leisure Vehicles, Inc.*, 96 Wis. 2d 607, 619, 292 N.W.2d 630 (1980) ("If the actor's negligent conduct is a substantial factor in

bringing about the harm it is a legal cause of that harm.") (internal quotations omitted); *Barrons v. J.H. Findorff & Sons, Inc.*, 89 Wis. 2d 444, 459, 278 N.W.2d 827 (1979) ("This court, in reaffirming the substantial-factor test in determining legal cause, . . . .") (internal quotations omitted); *Johnson v. Misericordia Comty. Hosp.*, 97 Wis. 2d 521, 560, 294 N.W.2d 501 (Ct. App. 1980).

¶ 98.    These cases are by no means the only cases in which the term "proximate cause" and "legal cause" have caused confusion, or are used to describe something other than policy factors which delimit liability. Indeed, they are the tip of the iceberg. In the time allocated to a dissent, I have only been able to consider about half of the 344 cases found by electronically searching for "proximate cause," and half of the 110 cases found by electronically searching for "legal cause."[3] Many of these cases use the unfortunate phrase "proximate cause" incorrectly or in an ambiguous way. Despite the supreme court's negative comments about the phrase "proximate cause," it shows no sign of disappearing from our legal lexicon.

¶ 99.    I attribute this problem to several things. First, the phrase, "proximate cause" has a nice ring to it, and we lawyers enjoy using it. It sounds lawyerly. The phrase has also been used by the legislature. See, for instance, WIS. STAT. § 895.44 (1999–2000) (exception to statutory immunity if negligence of state officer was "proximate cause" of injury or death). Finally, we have

---

[3] The term "legal cause" is also used by the legislature to mean something other than policy or "X" factors. *See* WIS. STAT. §§ 973.15(8)(a)1 and 118.16(1)(c) (1999–2000). The RESTATEMENT (SECOND) OF TORTS § 822 (1977) uses "legal cause" to describe cause in fact in nuisance cases. This adds confusion to Wisconsin tort law.

all studied *Palsgraf*, and using the term "proximate cause" still connotes to many of us the concept that "cause" or "cause in fact" is not enough for liability to exist. And while that is true, at least in the benign use of the term, the use of the term "proximate cause" needlessly adds confusion to Professor Campbell's amazingly simple and accurate method of analyzing torts in Wisconsin.

¶ 100. And how does this affect my view of the majority's opinion? Using Professor Campbell's analysis, I agree with the majority that Attorney Nunnery had a duty to represent Hicks competently. And I agree that the jury could find that he breached that duty. Both the majority and I agree that the jury could find that this breach of duty caused Hicks significant damages. But then the majority and I part company. The majority, instead of analyzing policy or "X" factors, examines cases from Massachusetts, California and New York which conclude that a plaintiff in a "criminal malpractice" case must, in every instance, prove his actual innocence of the crime. Majority at ¶¶ 38–43. To its credit, the majority has excised the phrase "proximate cause" from its decision. But its analysis is global, ignoring the rule set out in *Alwin, Sussex Tool, Bowen* and *Garrett*. Thus, the first way in which the majority deviates from the way that Wisconsin analyzes tort cases is its failure to analyze Hicks's case on its facts, or as Wisconsin cases require, on a "case-by-case" basis.

¶ 101. The second way the majority deviates from Wisconsin tort analysis is by adopting reasoning from other states without considering how these states construct their tort law, and how consistent those states' analyses are with Wisconsin's unique methodology. Thus, we need to examine not only *Wiley v. County of San Diego*, 966 P.2d 983 (Cal. 1998), but why the

California Supreme Court analyzed *Wiley* as it did, under California's view of its tort law. When we do so, we discover that although California appellate courts are not totally consistent, they have adopted the majority approach in *Palsgraf*, and use duty to the injured plaintiff as a method of limiting liability to foreseen consequences. *See Hegyes v. Unjian*, 286 Cal. Rptr. 85, 101–02 (Cal. Ct. App. 1992). This analysis was long ago explicitly rejected in Wisconsin. California does use public policy to limit recovery. The primary factor is foreseeability, but certainty of harm, closeness of connection between negligence and harm, moral blame, prevention of future harm, burden on defendant and consequences to community are also used. *Ma v. City & County of San Francisco*, 115 Cal. Rptr. 2d 544, 555 (2002).

¶ 102. In Wisconsin, foreseeability is not a policy factor, but a part of our broad definition of duty. *Olson v. Ratzel*, 89 Wis. 2d 227, 251, 278 N.W.2d 238 (Ct. App. 1979). Duty is the obligation of any person to refrain from any act that will cause foreseeable harm to others even though the nature of that harm and the identity of the harmed person or harmed interest are unknown at the time of the act. *Rockweit v. Senecal*, 197 Wis. 2d 409, 419–20, 541 N.W.2d 742 (1995). In this respect, Wisconsin represents the minority viewpoint in *Palsgraf*. *Rockweit*, 197 Wis. 2d at 420. It is not surprising, therefore, that California, which follows the majority viewpoint in *Palsgraf*, would conclude that in all cases, and as a matter of law, plaintiffs in "criminal malpractice" cases would need to prove actual innocence. Wisconsin's broad concept of duty, which does not include policy considerations, leads to a different result: Nunnery was clearly liable to Hicks. The only question

in Wisconsin should be whether policy considerations, applied *on a case-by-case basis,* should relieve Nunnery of liability.

¶ 103.   The majority explains that it is also influenced by *Glenn v. Aiken,* 569 N.E.2d 783 (Mass. 1991). Majority at ¶ 38. But Massachusetts, though its tort methodology is fragmented, certainly does not follow the Wisconsin rule. Massachusetts, like California, mostly follows the majority analysis in *Palsgraf,* always citing it favorably. *See, e.g., Nycal Corp. v. KPMG Peat Marwick, LLP,* 688 N.E.2d 1368, 1370 (Mass. 1989). In deciding whether a duty exists, Massachusetts courts look to "existing social values and customs, as well as to appropriate social policy." *Davis v. Westwood Group,* 652 N.E.2d 567, 569 (Mass. 1995). Or, as in *Yakubowicz v. Paramount Pictures Corp.,* 536 N.E.2d 1067 (Mass. 1989), the court concluded that the defendant owed the plaintiff a duty, but public policy barred the court from concluding that the duty was breached. And in *Poskus v. Lombardo's of Randolph, Inc.,* 670 N.E.2d 383 (Mass. 1996), the court intertwined duty and cause, concluding that a defendant did not cause an injury as a matter of law because the injury was not reasonably foreseeable. This is sometimes called "proximate cause," though not consistently. *See Westerback v. Harold F. LeClair Co.,* 735 N.E.2d 1256, 1258 (Mass. Ct. App. 2000). So, whether Massachusetts puts public policy considerations into duty or into cause, or both, it certainly does not use the broad definition of duty that governs Wisconsin cases. I am not surprised, therefore, that in Massachusetts, a rule applicable to all "criminal malpractice" cases is used.

¶ 104.   The majority also considers *Carmel v. Lunney,* 511 N.E.2d 1126 (N.Y. 1987), to be persuasive. Majority at ¶ 43 n.10. But, as we have seen, New York

is the birthplace of *Palsgraf*, and Justice Cardozo's majority opinion in which he concluded that a tortfeasor did not owe a duty to the plaintiff because the plaintiff was outside the zone of risk. This is still the rule in New York. *See Lauer v. City of New York*, 733 N.E.2d 184, 193 (N.Y. 2000). Wisconsin has specifically rejected New York's tort law methodology.

¶ 105.  In all these cases, the courts were concerned that guilty persons might be able to recover from negligent attorneys if a broad rule requiring actual innocence were not adopted. Though the majority here subdivides this reasoning into five sub-reasons, the cases the majority relies upon are almost totally based on a concern that a guilty person might be able to recover damages. If that's all there is to support the majority's conclusion that all persons who are imprisoned because of their attorneys' negligence must show actual innocence, Wisconsin's method of examining tort cases on an individual or case-by-case basis solves that problem easily. There is no reason to adopt a one-size-fits-all rule, when Wisconsin's simple but sophisticated analysis lets courts tailor the appropriate result to the facts of the case.

¶ 106.  How does Wisconsin's methodology apply to Hicks's case? I believe that the majority and I both agree that the jury could have reasonably found that Nunnery's negligence caused Hicks's damages. However, I would consider "X" factors and view Hicks's case as one somewhere between two other cases—Feleipe Harris's case, *Harris v. Bowe*, 178 Wis. 2d 862, 505 N.W.2d 159 (Ct. App. 1993), and the case of Christopher Ochoa, a case significantly reported in local media. Feleipe Harris told Milwaukee police that he had kicked a person "in his butt, in his back and in his chest." *Id.* at 864. He then confessed that he stomped on the person's

leg, hip and collarbone areas. *Id.* He described the person as just lying there with his eyes open—"he didn't look good." *Id.* After being convicted of first-degree reckless homicide on his guilty plea, Harris appealed. *Id.* at 866. His appellate attorney filed a no merit report, and we affirmed, concluding that any further appellate proceedings would be frivolous. *Id.* Harris then sued his attorney for malpractice. *Id.*

¶ 107.  Though Harris might have been able to show that his attorney was causally negligent and that this damaged him, I would conclude that he was not entitled to recover because allowance of recovery under these facts would be too likely to open the way for fraudulent claims. This is the fifth of six non-exclusive public-policy reasons Wisconsin uses to preclude liability in individual cases. *See Miller*, 219 Wis. 2d at 264–65. Or, I might conclude that *in this case,* the danger of a guilty person recovering damages was too great, and that as a matter of public policy, Harris could not recover.

¶ 108.  On the other end of the spectrum is Christopher Ochoa's case. Ochoa was convicted of murder and rape arising out of a single incident. Tom Kertscher, *Liberty and Justice at Last,* MILW. J. SENT., Jan. 17, 2001, at 1A. After spending a significant time in prison, Ochoa learned by accident that someone else had confessed to the murder and rape. Anita Clark, *Group Rides to the Rescue,* WIS. ST. J., Jan. 14, 2001, at A1. DNA tests showed that Ochoa could not have committed the rape. *Id.* The trial court granted Ochoa's motion to be released from prison. Kertscher, *supra,* at 1A. In Ochoa's case, I would conclude that in a subsequent "criminal malpractice" case, if a jury found that Ochoa's attorney's negligence caused Ochoa to be convicted,

public policy reasons would not prevent him from recovering from his attorney.

¶ 109. In neither Harris's nor Ochoa's case would I have required the criminal defendant to prove actual innocence before he could recover. Doing so would certainly prevent Harris from recovering, but would be an added and unneeded obstacle that might prevent Ochoa's recovery. To me, using policy considerations in each case individually, the proper Wisconsin tort analysis, ensures the appropriate result in both Harris's and Ochoa's cases.

¶ 110. The majority is uncomfortable with this analysis, preferring to force all plaintiffs in criminal malpractice cases to prove actual innocence. The result of this approach will weed out frivolous plaintiff's cases such as Harris's, but at the cost of sometimes weeding out deserving plaintiffs who should recover from their negligent attorneys. The majority's discomfort with judges deciding policy issues should have been settled long ago. Judges have been permitting or denying recovery for policy reasons since *Pfeifer*, in 1952. Actual innocence is as much a fact as the distance between Mrs. Palsgraf and the exploding fireworks. Yet there is no question that in Wisconsin, we would analyze her case using the policy factors first suggested by Professor Campbell. While that might cause discomfort to potential plaintiffs as well as to the majority, that is the methodology we have successfully used for fifty years.

¶ 111. Where does Hicks's case fit between Harris's case and Ochoa's case? It is not as strong as Ochoa's but much stronger than Harris's. DNA evidence strongly suggests that Hicks was not the perpetrator of the sexual assault for which he was convicted. The evidence is good but not perfect. I conclude that

Hicks is unlikely to be a guilty person attempting to recover a judgment against his attorney.

¶ 112.   The majority also suggests that a criminal defendant ought to be satisfied because he or she may be able to prevail in criminal court because his or her counsel was ineffective. I view this as little better than nothing. Telling Hicks that he should be happy with his release because he only spent four years in prison rather than nineteen does not sound like justice to me.

¶ 113.   Were I writing a majority opinion, I would follow the methodology that Professor Campbell initiated and Wisconsin has adopted. I would conclude that Nunnery had a duty to represent Hicks competently. I would conclude that the jury was entitled to find that Nunnery breached that duty, and that the breach caused damages to Hicks. And I would conclude that none of the policy factors found in *Miller*, 219 Wis. 2d at 264–65, and no other public policy reason required that Hicks's complaint against Nunnery should be dismissed. Thus, unlike the majority, I would affirm Hicks's judgment against Nunnery. That is why I respectfully dissent.